**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MERITAGE HOSPITALITY GROUP INC., *et al.*,[1] | ) | Case No. 26-02947 (JWB) |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF KEVIN CLEARY, CHIEF RESTRUCTURING OFFICER OF MERITAGE HOSPITALITY GROUP, INC. IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Kevin Cleary, hereby declare under penalty of perjury:

1. I am the Chief Restructuring Officer of the debtors (the "Company" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2. I am the managing partner and founder of Fort Dearborn Partners, which has provided strategic planning and profit improvement services to troubled companies for over 36 years. My experience includes service as interim chief executive officer or chief restructuring officer in manufacturing, printing, and distribution companies, among other industries, as well as serving as lead financial advisor in over eighty successful divestiture or distressed acquisition transactions. Before establishing Fort Dearborn Partners, I was partner in charge of the business and financial consulting practice at Grant Thornton in Chicago. I was retained by the Debtors on December 31, 2025.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Meritage Hospitality Group Inc. (0460); MHG Food Service, Inc. (5926); OCM Development, LLC (7384); Wen Carolinas, LLC (3792); Wen Georgia, LLC (7369); Wen Ohio, LLC; (5959); Wen Oklahoma, LLC (8802); Wen South, LLC (1229); Wen Tennessee, LLC (2477); Wen Virginia, LLC (2840); WM Limited Partnership-1998 (9989); RES Management, LLC (9105); Inspired By Opportunity, LLC (3681); Uncommon Hospitality, LLC (8858); and Chicken Ventures, LLC (7215). The corporate headquarters and the mailing address for the Debtors is 45 Ottawa Ave SW Suite 600, Grand Rapids, MI 49503.

3. As Chief Restructuring Officer, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records. I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") filed on September 17, 2026 (the "Petition Date"); and (b) the emergency relief that the Debtors requested from the Court pursuant to the motions filed contemporaneously herewith (each, a "First Day Motion," and collectively, the "First Day Motions").

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, my discussions with the Debtors' management team and advisors, information learned from my review of relevant documents and information supplied to me by members of the Debtors' management team, and consultation with the Debtors' other professional advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition. I have obtained this information during my tenure working with the Debtors, and my analysis of and experience with the Debtors' operations and circumstances is ongoing. To the extent that any information provided herein is materially inaccurate, I will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. In order to enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business operations, the Debtors have requested various types of relief in the First Day Motions aimed at, among other things, (a) preserving

customer and stakeholder relationships; (b) maintaining vendor confidence and employee morale; (c) ensuring the continuation of the Debtors' cash management system and other business operations without interruption; (d) securing access to cash collateral necessary to continue the Debtors' operations; and (e) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process. Gaining and maintaining the support of the Debtors' employees, customers, vendors and suppliers, lenders, creditors, and certain other key constituencies, as well as maintaining the Debtors' day-to-day business operations with minimal disruption, will be critical to the success of these Chapter 11 Cases.

6. This Declaration is divided into three parts. **Part I** provides an overview of the Debtors' business operations and describes the Debtors' business, organization structure, and prepetition indebtedness. **Part II** describes the circumstances precipitating the commencement of these chapter 11 cases. **Part III** summarizes the First Day Motions and explains why the relief requested therein is appropriate and necessary.

## I. OVERVIEW OF THE DEBTORS

### A. Corporate History and Overview

7. Meritage Hospitality Group Inc. (together with its debtor affiliates, the "Debtors" or the "Company") was incorporated under the laws of the State of Michigan in August 1986. The Company was originally founded as a hotel operating platform, subsequently sold its hotel portfolio, and entered the quick-service restaurant industry by purchasing 28 Wendy's restaurants in Michigan in 1998. In 2007, the Company completed a going-private transaction and began trading on the OTCQX. Beginning in 2009, the Company completed the first of 28 acquisitions by purchasing 20 Wendy's restaurants in Florida and set a goal of reaching 150 restaurants by 2015.

The Company exceeded that goal by year-end 2015, when it operated 166 restaurants. From 2011 through 2018, the Company acquired 234 additional restaurants, bringing its total to 317. In total, the Company has deployed nearly $400 million of capital across its portfolio, including the development of approximately 100 new restaurants and the refreshing of older, underperforming locations. In 2022, the Company won Wendy's Monument Award for "Visionary Growth and Expansion" in the large franchise category. The Company has been publicly traded for over 30 years. The Company's common stock is publicly traded on the OTC Markets under the symbol "MHGU," and the Company's Series B Preferred Stock is quoted on the OTC Markets under the symbol "MHGUP."

8. The Company operates 320 quick-service and casual dining restaurants across 15 states: Arkansas (8), Connecticut (29), Florida (44), Georgia (44), Indiana (13), Massachusetts (13), Michigan (54), Mississippi (7), Missouri (4), North Carolina (16), Ohio (12), Oklahoma (23), Tennessee (24), Texas (11), and Virginia (12). Of this total, 314 restaurants were Wendy's quick-service restaurants operated under franchise agreements with Quality Is Our Recipe, LLC ("QIOR"), a subsidiary of The Wendy's Company (collectively with QIOR, the "Franchisor"); one was a Bojangles quick-service restaurant operated under a franchise agreement with Bojangles Opco, LLC; and five were independent-concept restaurants—Morning Belle (breakfast/brunch) and Blue Porch Bar & Grill (casual dining)—located in Michigan. The Company is one of the largest Wendy's franchisees in the United States, having acquired 295 Wendy's restaurants through 28 separate transactions since 2009. A chart reflecting the Debtors' corporate structure is attached hereto as Exhibit A.

9. The Company previously operated seven Taco John's quick-service restaurants, all of which were permanently closed in September 2024. The Company exited the Taco John's franchise system effective November 2024.

10. Effective July 2025, the Company entered into a Development Agreement with Bojangles Opco, LLC to build 15 new Bojangles restaurants by April 2031. The first Bojangles restaurant opened in Michigan in February 2026.

**B. Prepetition Capital Structure**

11. As of summer 2026, the Debtors had total assets of approximately $725.9 million, total liabilities of approximately $651.2 million, and total equity of approximately $74.6 million.

12. The Debtors' primary credit facility is the Third Amended and Restated Credit Agreement with City National Bank as administrative agent (the "Primary Credit Facility"). The Primary Credit Facility provides for revolving credit commitments of up to $251,400,000 and matures in April 2027. As of the Petition Date, the outstanding principal balance under the Primary Credit Facility was approximately $137.0 million.

13. Debtor, Uncommon Hospitality, LLC, maintains a credit facility with Old National Bank (the "Secondary Credit Facility"), providing for commitments of up to $24,500,000, maturing in May 2028. As of the Petition Date, the outstanding balance under the Secondary Credit Facility was approximately $15.0 million.

14. Debtor, OCM Development, LLC, has three loans from Union Bank. As of the Petition Date, the outstanding balance was approximately $2.8 million.

15. Substantially all of the Debtors' property and equipment is pledged as collateral to secure the obligations under the various and credit facilities. The Debtors' operating lease

obligations total approximately $390.8 million, with a weighted average remaining lease term of approximately 13 years.

16. Further detail regarding the Debtors' prepetition capital structure is included in my declarations supporting each cash collateral motion, respectively [Docket Nos. 28, 30, and 32].

## II. EVENTS LEADING TO THESE CHAPTER 11 CASES

### A. Wendy's Brand and Margin Compression

17. Beginning in 2024 and accelerating through fiscal 2025, a convergence of external factors severely compressed the Company's operating margins. Wendy's U.S. same-store sales fell 11.3% in the fourth quarter of fiscal 2025. The principal factors contributing to margin compression included: (1) reduced frequency and effectiveness of Wendy's brand marketing under prior franchisor management; (2) record U.S. beef prices, driven by historically low herd levels, a shutdown of Mexican border beef imports due to disease, and tariffs on importation of beef from South America, resulting in an 18.9% increase in the Company's average cost of beef for the three months ended June 28, 2026 as compared to the prior-year period; (3) unusual winter weather associated with a La Niña cycle in the southern United States, which created highly disruptive impacts on sales; and (4) margin compression resulting from deep discounting and national promotional strategies at the brand level.

### B. Declining Revenue and Profitability

18. The Company's total revenue for fiscal year 2025 was $617.7 million, a decrease of 7.6% from $668.8 million in fiscal year 2024. Revenue for the six months ended June 28, 2026 was $273.6 million, a decrease of 14.0% from $318.1 million for the corresponding period in 2025. Same-store sales decreased 7.2% in fiscal 2025 and 8.3% for the six months ended June 28, 2026 as compared to the prior-year periods. The Company reported a net loss of $31.5 million for fiscal

2025, compared to net income of $8.0 million in fiscal 2024. The Company also reported a net loss of $23.1 million for the six months ended June 28, 2026.

**C. Defaults and Forbearance Agreements**

19. In the fourth quarter of fiscal 2025, the Company received notices of events of default from City National Bank, as administrative agent for the Lenders, and from QIOR, the Franchisor. Defaults under the Credit Agreement included the Company's failure to maintain certain financial covenants and its failure to pay obligations as they became due, including payments to the Franchisor. Defaults under the Franchise Agreements included the Company's failure to remit required payments when due.

20. The Company entered various waivers and forbearance agreements with their respective lenders other than Union Bank. The Company also entered into a Letter of Agreement with QIOR effective November 2025, and subsequently entered into a First Amended Letter of Agreement effective January 2026 and a Second Amended Letter of Agreement effective April 2026, pursuant to which the Franchisor conditionally agreed not to cancel or terminate the Franchise Agreements through August 2026.

21. In response to the foregoing challenges, management retained Fort Dearborn Partners, and Kevin Cleary of Fort Dearborn Partners was appointed as the Company's Chief Restructuring Officer ("CRO"). Under the CRO's direction, the Company undertook a comprehensive restructuring and portfolio optimization program, the principal elements of which are summarized below.

a. The Company closed approximately 60 underperforming Wendy's locations beginning in the fourth quarter of fiscal 2025, with an estimated annual EBITDA benefit of approximately $8.0 million on a going-forward basis.

b. The Company exited or altered the breakfast daypart at numerous

locations since 2025. These measures had an estimated annual EBITDA benefit of approximately $3.2 million.

c. The Company cut $7.3 million in general and administrative and operational expenses through internal restructuring.

d. The Company completed 18 sale-and-leaseback transactions in fiscal 2025, netting proceeds of $41.1 million and using $33.7 million of those proceeds to pay down debt. The Company completed five additional sale-and-leaseback transactions in the first half of fiscal 2026, netting $11.3 million in proceeds.

e. The Company suspended its 401(k) employer matching contribution effective November 2025.

22. Both the Second Amended and Restated Letter of Agreement with QIOR and the Third Amendment to Forbearance Agreement with City National Bank expired on their stated terms on or about August 18, 2026. As of that date, QIOR and the Lenders were no longer prevented from taking enforcement actions in respect of the outstanding events of default. The Company was engaged in continued negotiations with QIOR and the Lenders to renew forbearance and standstill terms through October 2026.

23. Such potential forbearances never materialized. On September 16, 2026, QIOR delivered a Notice of Termination of Franchise Rights and Termination of Lease Occupancy Rights (the "Termination Notice") purporting to terminate all Franchise Agreements "effective immediately." The Debtors dispute the effectiveness of the Termination Notice as a matter of law and under the terms of the respective Franchise Agreements. The Debtors contend that the Franchise Agreements remain in effect and are property of the bankruptcy estates.

24. QIOR asserts the Debtors owe $27,397,866.15 in past-due royalties and fees and $119,486,650.00 in Continuous Operations Fees, for a total claimed amount of approximately $146.9 million.

25. On September 17, 2026, the Debtors commenced the above-captioned cases. The automatic stay under 11 U.S.C. § 362(a) took effect immediately upon the filing of the petitions.

## III. FIRST DAY MOTIONS[2]

26. Along with this Declaration, the Debtors filed the First Day Motions, seeking orders granting various forms of relief intended to facilitate the efficient administration of these Chapter 11 Cases. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful bankruptcy process; and (c) is in the best interests of the Debtors, their estates, and their creditors.

27. The Debtors intend to review all strategic options that preserve the core Wendy's franchise operations and maximizes value for all stakeholders. The key elements of the Debtors' restructuring strategy include: (a) continued portfolio optimization through the closure or sale of underperforming locations; (b) resolution of the franchise termination dispute with QIOR; (c) potential strategic market sales to generate liquidity and reduce the portfolio to a sustainable size; and (d) recapitalization of the balance sheet. The Debtors believe they can achieve a successful restructuring that maximizes value for all stakeholders while preserving jobs and restaurant operations across the 15-state footprint.

28. Continued access to the Wendy's franchise system is indispensable to any viable restructuring. The Debtors respectfully submit that the relief requested in the first day motions is necessary and appropriate to preserve the status quo and to afford the Debtors a meaningful

---

[2] Capitalized terms used but not defined in this section shall have the meanings set forth in the applicable First Day Motion.

opportunity to reorganize. The First Day Motions seek orders granting various forms of relief intended to stabilize the Debtors' business operations, minimize the adverse effects of the commencement of these Chapter 11 Cases, and facilitate the efficient administration of these Chapter 11 Cases. Further, a vast majority of these motions are both procedural and non-adversarial, in addition to having the support of the Debtors' prepetition senior secured lenders. The First Day Motions include:

**A. *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion")**

29. The Joint Administration Motion seeks joint administration for procedural purposes only will provide significant administrative convenience without harming the substantive rights of any party in interest. Specifically, the Debtors request that one file and one docket be maintained for all of the jointly administered cases under the case of Meritage Hospitality Group Inc. Given the integrated nature of the Debtors' operations, joint administration will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity. Joint administration will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases efficiently and with greater ease, as all filings will be available on one docket rather than across three dockets. The relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption. Parties in interest will also benefit from the cost reductions associated with joint administration of the Debtors' Chapter 11 Cases

**B.** ***Debtors' Application for Appointment of Kroll Restructuring Administration as Claims, Noticing and Solicitation Agent* (the "Kroll Retention Application")**

30. In the Kroll Retention Application, the Debtors seek entry of an order authorizing the Debtors to employ Kroll Restructuring Administration ("Kroll") as claims, noticing, and solicitation agent in accordance with the terms and conditions set forth in the engagement letter attached to the Kroll Retention Application. The Debtors request approval to employ Kroll to serve as Claims and Noticing Agent in their chapter 11 cases to provide the services outlined in their engagement letter. The Debtors believe that the appointment of Kroll as claims and noticing agent is in the best interest of the Debtors' estates and their creditors because the distribution of notices and the processing of claims will be expedited. The relief requested in the Kroll Retention Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, as Kroll has the expertise required for complex chapter 11 cases, and their services and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**C.** ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated (1) Creditor Matrix and (2) Top Thirty Creditors List, and (B) Redact Certain Personal Identification Information In The Creditor Matrix and Certain Other Documents; (II) Modifying the Requirement to File a List of All Equity Security Holders and Modifying Notice Requirements to Equity Security Holders; and (III) Granting Related Relief* (the "Creditor Matrix Motion")**

31. The Creditor Matrix Motion seeks authority to (a) file a consolidated creditor matrix and top 30 creditor list; and (b) redact certain personally identifiable information for individuals within the consolidated list of creditors and (c) waiving the requirement to file a list of and provide notice directly to equity security holders. Consolidation of the creditor matrix and top 30 creditor list helps to ease the administrative burden in these cases, and redaction helps protect information for individuals involved. Preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties will also create undue expense and administrative burden with limited corresponding benefit to the estates or

parties in interest in these cases. Meritage Hospitality Group Inc. will still file a list of its significant holders of their outstanding stock and provide notices to these parties.

**D.** ***Debtors' Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (II) Granting Related Relief*** **(the "Schedules Extension Motion")**

32. The Schedules Extension Motion seeks a court order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (the "Schedules and Statements") by 32 days, for a total of 46 days from the Petition Date, through and including November 2, 2026. Schedules and Statements. Ample cause exists to grant said extensions, as to prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to hundreds of claims, assets, leases, and contracts from each of the fifteen Debtor entities, requiring a significant expenditure of time and effort on the part of the Debtors. Preparation of these documents was not practicable prepetition, given circumstances. Finally, the relief requested will not prejudice any party in interest.

**E.** ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief*** **(the "Taxes Motion")**

33. Pursuant to the Taxes Motion, the Debtors seek entry of an order (i) authorizing the Debtors to pay certain prepetition taxes and related obligations and (ii) granting related relief. In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to sales and use, property, income, franchise, annual reporting fees, audits, and business and regulatory fees. The Debtors remit the Taxes and Fees to various federal, state, and local governments and authorities on a monthly, quarterly, semi-annual, or annual basis.

34. Certain of the Taxes may constitute so-called "trust-fund" obligations that (i) are required to be collected from third parties and held in trust for payment to taxing and regulatory authorities and (ii) are not property of the Debtors' estates. Many of the Taxes are priority claims entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code and, thus, must be paid in full under any chapter 11 plan before any distribution is made to general unsecured creditors. Delayed payment of the Taxes may cause the Taxing Authorities to take disruptive actions, including audits, lien filings, moving for relief from the automatic stay, and other administrative procedures, all of which would consume valuable time and resources and divert the Debtors' attention from their business operations and restructuring efforts.

35. The Debtors seek authority to make payments where (a) the Taxes and Fees have accrued or were incurred prepetition but (i) were not paid prepetition or (ii) were paid in an amount less than actually owed, (b) the Debtors made payments prepetition that were lost or the Taxing Authorities did not receive the prepetition payments in full, which may give rise to interest and other penalties, (c) the Taxes and Fees were incurred for prepetition periods and become due and payable after the Petition Date, (d) the Taxes and Fees accrued or are incurred postpetition, and (e) the Taxes and Fees are for so-called "straddle" periods.

36. Failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations. Paying the Taxes and Fees is both a sound exercise of the Debtors' business judgment and further the efficient and value-maximizing administration of the Debtors' estates. The relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**F. *Debtors' Motion For Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage, and (C) Continue to Pay Brokerage Fees, and (II) Granting Related Relief* (the "Insurance Motion")**

37. Pursuant to the Insurance Motion, the Debtors seek entry of an order, (a) authorizing the Debtors to (i) continue their Insurance Program on an uninterrupted basis in the ordinary course of the Debtors' businesses, (ii) renew, supplement, modify, extend, terminate, or purchase insurance policies in the ordinary course of business on a postpetition basis, and (iii) pay all prepetition and postpetition insurance obligations relating to the Insurance Program, as applicable (collectively, the "Insurance Obligations") and (b) granting related relief.

38. In the ordinary course of business, the Debtors maintain approximately 16 insurance policies with numerous third-party insurance carriers. The Insurance Policies provide coverage for, among other things, automobile, crime, cyber liability, director and officer liability, employed lawyers professional liability, employment practices liability, fiduciary liability, general liability, international liability, products and completed operations liability, property, and workers compensation. In addition, certain of the Insurance Policies provide layers of excess liability coverage. As of the Petition Date, the Debtors do not believe there are any accrued but unpaid amounts, but seek authority to continue paying the insurance policies nonetheless out of an abundance of caution.

39. To preserve the value of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance policies. In many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the U.S. Trustee. The relief requested in the Insurance Motion is to ensure uninterrupted coverage under the

Insurance Policies. Therefore, the Debtors seek authorization to maintain the existing Insurance Policies and brokerage accounts, pay prepetition obligations (if any) related thereto upon entry of the order, and renew, amend, supplement, extend, or purchase new Insurance Policies on a postpetition basis in the ordinary course of business consistent with past practice. The relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### G. ***Debtors' Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief*** **(the "<u>Utilities Motion</u>")**

40. Pursuant to the Utilities Motion, and in light of the severe consequences to the Debtors' operations should the Utility Companies interrupt their services, the Debtors seek entry of an order (a) determining that the Adequate Assurance Deposit provides the Utility Companies with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Companies from altering, refusing, or discontinuing services, (c) approving the Adequate Assurance Procedures for resolving any dispute in connection with the Adequate Assurance Deposit, and (d) granting related relief.

41. On average, the Debtors spend approximately $1,720,000 per month on utilities, excluding utility amounts paid through rent at certain of their retail locations. As of the Petition Date, the Debtors estimate that approximately $980,000 is outstanding on account of prepetition Utility Services. The Debtors intend to satisfy postpetition obligations owed to the Utility Companies in the ordinary course of business and in a timely manner. Cash on hand and cash generated in the ordinary course of business as well as anticipated access to cash collateral

available will provide the Debtors with sufficient liquidity to pay the Utility Companies for Utility Services in accordance with past practice.

42. As the Adequate Assurance Deposit, the Debtors propose to deposit $300,000 into a segregated account after the Order is entered. The Adequate Assurance Deposit is equal to approximately one half of the Debtors' average monthly cost of Utility Services, calculated based on the historical average of payments made to the Utility Companies over the approximate twelve-month period prior to the Petition Date, excluding certain amounts and subject to certain adjustments. Currently, no Utility Companies hold deposits for the Utility Services. The Proposed Adequate Assurance demonstrates the Debtors' ability to pay for future Utility Services in accordance with past practice and constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code. The relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**I.** ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer Their Existing Customer Programs and (B) Honor Certain Prepetition Obligations and (II) Granting Related Relief*** **(the "Customer Programs Motion")**

43. Through the Customer Programs Motion, the Debtors seek to continue the Debtors' Customer Programs, including, among others: (a) gift card programs, (b) a Wendy's rewards loyalty program. Maintaining the goodwill of their customers is critical to the Debtors' ongoing sales efforts in these Chapter 11 Cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

44. As of the Petition Date, the Debtors estimate that there are approximately $1,438,000 of prepetition obligations outstanding related to Customer Programs. These

obligations include accrued gift cards, loyalty awards, and other similar programs owing to customers. The majority of these obligations *do not* entail the expenditure of cash. Accordingly, by this Motion, the Debtors seek authorization, but not direction, to maintain the Customer Programs in the ordinary course of business and consistent with past practices and to continue to honor all customer-related obligations, including honoring any prepetition obligations associated therewith. For the avoidance of doubt, by this Motion, the Debtors are not seeking to assume or reject any executory contracts pursuant to section 365 of the Bankruptcy Code. Continuing the identified Customer Programs is essential to maintaining the Debtors' customer base for its store closing sales during the chapter 11 cases.

**K.** ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Honor and Continue Their Employee Benefits Programs and (II) Granting Related Relief* (the "Employee Wages and Benefits Motion")**

45. Through the Employee Wages and Benefits Motion, the Debtors seek authority to pay and honor certain prepetition obligations for, among other things: (a) wages, salaries, and other compensation; (b) employee discounts; (c) reimbursable expenses; (d) cell phone and mileage reimbursement; (e) withholding obligations and payroll taxes; (f) payroll processing; (g) health insurance benefits; (h) health savings accounts; (i) flexible spending accounts; (j) life and AD&D insurance; (k) disability and other insurance; (l) workers' compensation obligations; and (m) paid time off and sick leave (collectively, and as more fully described herein, the "Employee Compensation and Benefits Programs"), and to pay all costs incident to the foregoing.

46. As of the Petition Date, the Debtors employ approximately 8,850 employees who perform a variety of critical functions for the Debtors. The Debtors must retain their Employees' skills and their knowledge and understanding of the Debtors' infrastructure, operations, and customer relations to effectively reorganize and maximize value for the benefit of all of the

Debtors' stakeholders. The Debtors' Employees rely on their compensation and benefits for their daily living needs and to support their families. If the Debtors are not permitted to continue to meet and sustain their payroll and benefits obligations, the Debtors' workforce will be materially and negatively impacted, which the Debtors expect would affect productivity and retention and, in turn, threaten the Debtors' ability to continue their operations. The Debtors' timely payment of workforce-related obligations is essential for the Debtors to maintain ordinary course operations and avoid personal financial hardship to the Employees.

**L. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Honor Certain Obligations Relating Thereto, (C) Maintain Existing Business Forms and Books and Records, and (D) Continue to Perform Intercompany Transfers; (II) Granting a Waiver of Certain Deposit and Investment Requirements in 11 U.S.C. § 345(b) and the U.S. Trustee Guidelines; and (III) Granting Related Relief* (the "Cash Management Motion")**

47. The Cash Management Motion seeks authority for the Debtors to, among other things: continue to operate their cash management system as set forth in the Cash Management Motion and maintain their existing bank accounts set forth on the exhibit to the Cash Management Motion, including honoring certain prepetition obligations related thereto, and continue Intercompany Transactions and funding consistent with the Debtors' historical practice. The Debtors use the Cash Management System to collect and disburse cash generated by their business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, obtain accurate account balances and other financial data, forecast financial performance, and ensure cash availability and liquidity. The Cash Management System is tailored to meet the Debtors' operating needs while reducing administrative expenses. The Debtors maintain daily oversight over the Cash Management System and implement controls for entering, processing, and releasing funds. Any disruption to the Cash

Management System would have an immediate adverse effect on the Debtors' business and operations to the detriment of their estates and numerous stakeholders.

48. The principal source of revenue for the Debtors' business is payments from their retail customers. The Debtors depend on the efficient collection, transfer, and disbursement of funds. Given the economic and operational scale and complexity of the Debtors' enterprise, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders. Additionally, Intercompany Transactions are an integral part of the Cash Management System and essential to the Debtors' continued operations. Absent the relief requested, the Debtors would be required to adopt a new, segmented cash management system, or find different service providers, which would be financially and logistically burdensome and cause the Debtors' operations to grind to a halt, reducing the value of the Debtors' business. To minimize the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System and continue Intercompany Transfers, along with certain other relief requested in the Cash Management Motion.

49. Overall, each of these motions seek to ensure the continuation of the Debtors' business operations without interruption as they transition into chapter 11. Further, continued access to the Wendy's franchise system is indispensable to any viable reorganization. I believe that the relief requested in the motions is necessary to give the Debtors an opportunity to work towards successful Chapter 11 Cases that will benefit all of the Debtors' stakeholders.

50. Several of these motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days

following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

51. In my opinion, approval of the relief sought in each of the motions is critical to successfully implementing the Debtors' chapter 11 strategy efficiently and with minimal disruption to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 18, 2026

Kevin Cleary
Chief Restructuring Officer