**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERITAGE HOSPITALITY GROUP INC., *et al.*,[1] | ) | Case No. 26-02947 (JWB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS; (B) AUTHORIZING THE DEBTORS TO DESIGNATE ONE OR MORE STALKING HORSE BIDDERS AND TO PROVIDE BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (E) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (F) GRANTING RELATED RELIEF; AND (II) ONE OR MORE ORDERS (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

Meritage Hospitality Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases") hereby file this motion (the "Motion"), pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of the United States Bankruptcy Court for the Western District of Michigan (the "Local Rules"), for entry of (i) an order, substantially in the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Meritage Hospitality Group Inc. (0460); MHG Food Service, Inc. (5926); OCM Development, LLC (7384); Wen Carolinas, LLC (3792); Wen Georgia, LLC (7369); Wen Ohio, LLC (5959); Wen Oklahoma, LLC (8802); Wen South, LLC (1229); Wen Tennessee, LLC (2477); Wen Virginia, LLC (2840); WM Limited Partnership-1998 (9989); RES Management, LLC (9105); Inspired By Opportunity, LLC (3681); Uncommon Hospitality, LLC (8858); and Chicken Ventures, LLC (7215). The corporate headquarters and the mailing address for the Debtors is 45 Ottawa Ave SW Suite 600, Grand Rapids, MI 49503.

form attached hereto as Exhibit A (the "Bidding Procedures Order"), approving the bidding procedures attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures") and granting the related relief described below, and (ii) following the Auction (if any), one or more orders (each, a "Sale Order") approving the sale of the Assets free and clear of all liens, claims, encumbrances, and interests and authorizing the assumption and assignment of certain executory contracts and unexpired leases. The Debtors intend to file declarations in support of the relief requested herein and provide further evidentiary support at the hearings on this Motion.

In support of this Motion, the Debtors respectfully represent as follows:

## Preliminary Statement

1. The Debtors are one of the largest Wendy's franchisees in the United States, at one time operating approximately 320 quick-service and casual dining restaurants across fifteen states. Beginning in 2024 and accelerating through fiscal 2025, a convergence of brand-level, commodity, and weather-related pressures compressed the Debtors' operating margins, eroded revenue, and led to defaults under the Debtors' credit facilities and the Franchise Agreements with Franchisor. On September 16, 2026, the day before the Petition Date, the Franchisor delivered the Termination Notice purporting to terminate all of the Franchise Agreements, which the Debtors dispute.

2. After filing for chapter 11 bankruptcy, the Debtors worked to reach a framework to move forward with a sale process in the bankruptcy cases, subject to a formal settlement agreement (the "Settlement") and Court approval thereof[2], with Wendy's International, LLC ("WIL"), Quality Is Our Recipe, LLC ("QIOR"), the Committee, City National Bank, as administrative

[2] Contemporaneously with the filing of this Motion, the Debtors are also filing a motion pursuant to Rule 9019 of the Bankruptcy Rules seeking approval of such settlement. While the parties have arrived at a settlement in principle, the final terms of the Bidding Procedures and related documents continue to be revised and the Debtors will supplement the record with a final version in advance of the hearing on this Motion, currently scheduled for November 24, 2026. Each of the Debtors, the Committee, QIOR, the Administrative Agent, and Old National expressly reserve all of their rights, claims and defenses pending resolution of mutually acceptable Bidding Procedures and Court approval thereof.

agent (the "Administrative Agent"), and Old National Bank, as lender to Uncommon Hospitality, LLC ("Old National"). Under that framework, WIL will serve as the stalking horse bidder for 163 Wendy's restaurants (the "Purchased Restaurants") and four parcels of owned real estate (the "Purchased RE").

3. The Settlement resolves, for purposes of the sale process, the parties' dispute over the Termination Notice and the approximately $146.9 million that QIOR asserts is owed. As a result, the Debtors can market their Assets free of the cloud of the Termination Litigation. Importantly, the Settlement provides that immediately prior to the closing of the sale of any Purchased Restaurant, CT/MA Restaurant, NC Restaurant, or Tennessee Restaurant, the applicable Franchise Agreements will be reinstated solely for the purpose of effectuating such sale, and, as to Locations acquired by a new or existing franchisee approved by QIOR, QIOR will consent either to new franchise agreements or to the assumption and assignment of the reinstated Franchise Agreements (subject to QIOR's consent rights and an expedited franchisee approval process). QIOR has also consented to the sale for the CT/MA Restaurants and the NC Restaurants through an auction process.

4. In light of the Settlement, the Debtors have established Bidding Procedures to govern the sale of substantially all of their remaining assets. The Bidding Procedures are structured to provide a fair, open, and value-maximizing framework to test the WIL Stalking Horse Bid in the market and to solicit competing bids for all, substantially all, or any portion of the Debtors' remaining Assets, whether on an enterprise, lot, or individual-Location basis. The Bidding Procedures permit the Debtors to compare enterprise bids against combinations of partial bids on a transparent, like-for-like basis, provide for the designation of additional stalking horse bidders with limited and Court-supervised bid protections, preserve the credit bid rights of the Prepetition

Secured Lenders, preserve the Franchisor's rights, and afford the Consultation Parties meaningful consultation rights throughout the process.

5. The proposed timeline is driven by the Debtors' liquidity needs, the Cash Collateral Orders, and the milestones that will be set forth in the WIL Stalking Horse APA, which require a Sale Order to be entered no later than December 31, 2026 and closing by January 5, 2027. The Debtors submit that the relief requested is a sound exercise of their business judgment and in the best interests of their estates, creditors, and all parties in interest, and should be approved.

## Jurisdiction and Venue

6. The Court has jurisdiction over the Chapter 11 Cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7. Venue of the Chapter 11 Cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8. The statutory and rule-based predicates for the relief requested herein are sections 105(a), 363(b), (f), (k), (m), and (n), 365, 503(b), and 507(a)(2) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and the applicable Local Rules.

## Background

### A. General Case Background

9. On September 17, 2026 (the "Petition Date"), each of the Debtors filed with the United States Bankruptcy Court for the Western District of Michigan (the "Court") a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for procedural purposes.

10. On September 30, 2026, the Office of the United States Trustee for Region 9 (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

11. Additional factual background regarding the Debtors, including their business operations, capital structure, and the events leading to the commencement of the Chapter 11 Cases, is set forth in the *Declaration of Kevin Cleary in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 34] (the "Cleary Declaration"), which is incorporated herein by reference.

**B. The Debtors' Business**

12. Meritage Hospitality Group Inc. ("Meritage") was incorporated under the laws of the State of Michigan in August 1986. Originally founded as a hotel operating platform, the company sold its hotel portfolio and entered the quick-service restaurant industry in 1998 by purchasing 28 Wendy's restaurants in Michigan. Beginning in 2009, the Debtors completed the first of 28 acquisitions and grew to 166 restaurants by year-end 2015 and to 317 restaurants by 2018. In total, the Debtors have deployed nearly $400 million of capital across their portfolio, including the development of approximately 100 new restaurants. Meritage's common stock is quoted on the OTC Markets under the symbol "MHGU," and its Series B Preferred Stock under the symbol "MHGUP."

13. As of the Petition Date, the Debtors operated approximately 320 quick-service and casual dining restaurants across fifteen states: Arkansas, Connecticut, Florida, Georgia, Indiana, Massachusetts, Michigan, Mississippi, Missouri, North Carolina, Ohio, Oklahoma, Tennessee, Texas, and Virginia. Of those restaurants, 314 were Wendy's restaurants operated under franchise agreements with QIOR, a subsidiary of The Wendy's Company (together with QIOR and, as

applicable, its affiliates, the "Franchisor", and such agreements, the "Franchise Agreements"); one was a Bojangles restaurant, which has since closed; and five are independent-concept restaurants operated in Michigan under the Morning Belle and Blue Porch Bar & Grill brands (the "Independent Concept Locations"). As of the Petition Date, the Debtors employed approximately 8,850 employees.

### C. Prepetition Capital Structure

14. As of summer 2026, the Debtors had total assets of approximately $725.9 million and total liabilities of approximately $651.2 million. The Debtors' prepetition secured indebtedness consists principally of: (a) the Third Amended and Restated Credit Agreement with City National Bank, as Administrative Agent (the "CNB Credit Facility"), which provides for revolving commitments of up to $251.4 million and under which approximately $137.0 million in principal was outstanding as of the Petition Date; (b) the credit facility extended by Old National to Debtor Uncommon Hospitality, LLC (the "ONB Credit Facility"), under which approximately $15.0 million was outstanding; and (c) three loans extended by Union Bank ("Union Bank" and, together with the Administrative Agent and Old National, the "Prepetition Secured Lenders") to Debtor OCM Development, LLC ("OCM") (the "Union Bank Loans"), under which approximately $2.8 million was outstanding. Substantially all of the Debtors' property and equipment is pledged as collateral. The Debtors' operating lease obligations total approximately $390.8 million, with a weighted average remaining term of approximately 13 years.

15. The Debtors' use of cash collateral is governed by the interim and final orders entered by the Court [Docket Nos. 103, 104, 105, 256, 257, 258] and any further orders entered with respect thereto (collectively, the "Cash Collateral Orders").

**D. Events Leading to the Chapter 11 Cases and the Need for a Sale**

16. Beginning in 2024 and accelerating through fiscal 2025, the Debtors' operating margins were severely compressed by, among other things, reduced effectiveness of brand-level marketing, record U.S. beef prices (resulting in an 18.9% increase in the Debtors' average cost of beef for the three months ended June 28, 2026 compared to the prior-year period), disruptive winter weather in the southern United States, and deep discounting and national promotional strategies at the brand level. Total revenue declined from $668.8 million in fiscal 2024 to $617.7 million in fiscal 2025, and to $273.6 million for the six months ended June 28, 2026, a 14.0% decrease from the prior-year period. The Debtors reported a net loss of $31.5 million for fiscal 2025 and $23.1 million for the first six months of 2026.

17. In the fourth quarter of fiscal 2025, the Debtors received notices of default from the Administrative Agent and from QIOR. The Debtors entered into waivers and forbearance agreements with their lenders (other than Union Bank) and a series of letter agreements with QIOR, retained Fort Dearborn Partners, and appointed Kevin Cleary as Chief Restructuring Officer.

18. The forbearance agreement with the Administrative Agent and the letter agreement with QIOR expired on or about August 18, 2026, and renewed forbearance never materialized. On September 16, 2026, QIOR delivered a *Notice of Termination of Franchise Rights and Termination of Lease Occupancy Rights* (the "Termination Notice"). QIOR asserts that the Debtors owe approximately $146.9 million, consisting of $27,397,866.15 in past-due royalties and fees and $119,486,650.00 in Continuous Operations Fees. The Debtors dispute the effectiveness of the Termination Notice and contend that the Franchise Agreements remain in effect and constitute property of the estates, and they commenced an adversary proceeding against QIOR that is currently pending (Case No. 26-80079) (the "Termination Litigation").

19. As the Cleary Declaration details, continued access to the Wendy's franchise system is indispensable to any viable restructuring, and the Debtors' restructuring strategy contemplates portfolio optimization through the closure or sale of underperforming locations, resolution of the franchise dispute, and strategic market sales. Consistent with that strategy, the Debtors have already received approval of a private sale of their 42 Wendy's restaurants in Tennessee, Missouri, Mississippi, and Arkansas (the "Tennessee Restaurants"), which are excluded from the sale process described herein. The sale process proposed by this Motion is the next, and central, step in that strategy.

**E. The Marketing Process and the WIL Stalking Horse Bid**

20. The Debtors have retained Intrepid Investment Bankers LLC ("Intrepid" or the "Investment Banker") to market the Assets. In consultation with the Investment Banker, the Debtors have developed a list of potential purchasers, including existing Wendy's franchisees, other restaurant operators, strategic investors, financial sponsors, and real estate investors (the "Contact Parties"), and will provide each interested party that executes a confidentiality agreement with access to an electronic data room (the "Data Room").

21. The Debtors intend to enter into, no later than November 21, 2026, an asset purchase agreement (the "WIL Stalking Horse APA") with WIL, an affiliate of QIOR, for the acquisition of the Purchased Restaurants and the Purchased RE, located at 5166 Airport Highway, Toledo, Ohio; 828 S. Kalamazoo, Paw Paw, Michigan; 3805 Sprinkle Road, Kalamazoo, Michigan; and 1509 Lincoln Road, Allegan, Michigan.[3] The material terms of the WIL Stalking Horse Bid, as set forth in Section 7.9 of the Bidding Procedures, are summarized below:[4]

[3] To the extent Local Rule 6004(a) is implicated by this sale process, legal descriptions of the locations comprising the Purchased RE can be included in the WIL Stalking Horse APA.

[4] To the extent of any inconsistency between this summary and the Bidding Procedures or the WIL Stalking Horse APA, the WIL Stalking Horse APA and the Bidding Procedures shall control.

| Term | Summary |
|---|---|
| Purchaser | Wendy's International, LLC, which may act through one or more designees, including Prospective Franchisees for Purchased Restaurants in the Texas or Oklahoma markets (Bidding Procedures § 7.9(g)). |
| Purchased Assets | 163 Purchased Restaurants and all of the Debtors' interests in the tangible and intangible assets used in their operation, and the Purchased RE, free and clear pursuant to sections 105, 363, and 365 of the Bankruptcy Code (§§ 1.3, 7.9(i)). |
| Purchase Price | Base purchase price of $53,118,000, less an image activation credit of $7,200,000, for a net cash base purchase price of $45,918,000, subject to adjustment for Franchisor Cure Costs, a $3,260,000 deferred maintenance credit ($20,000 per Purchased Restaurant), Cure Costs paid to WIL, unamortized beverage advances, inventory and cash on hand, and customary prorations; plus $6,000,000 for the Purchased RE (§ 7.9(b)). No holdback or escrow. |
| Deposit | $2,000,000, paid by QIOR to Chicago Title as escrow agent, refundable unless WIL fails to close due to its uncured material breach (§ 7.9(d)). |
| Bid Protections | None. WIL is not entitled to any break-up fee, expense reimbursement, or other bid protections (§§ 7.4(d), 7.9(b)). |
| Backup Bidder | If a third party is selected for the Purchased Restaurants or Purchased RE, WIL serves as Backup Bidder through the Outside Closing Date (§ 7.9(c)). |
| Excluded Stores | WIL may exclude any Additional Designated Restaurant, without price adjustment, by written notice received by December 15, 2026 (§ 7.9(f)). |
| Mutual Release; Termination Litigation | Mutual release among the Debtors, franchisees and guarantors, the Administrative Agent, Old National, other secured lenders, WIL, and QIOR, effective upon closing or the Debtors' selection of an Alternative Transaction; Termination Litigation paused and dismissed with prejudice upon consummation (Settlement; WIL Stalking Horse APA). |
| Conditions and Milestones | Board approvals; secured lender approval no later than execution of the WIL Stalking Horse APA; Court approval under sections 363, 365, and 105 and Bankruptcy Rule 9019, which the Debtors shall use best efforts to obtain by December 31, 2026; closing no later than January 5, 2027 (§ 7.9(j)). |

| Term | Summary |
|---|---|
| Employees; Transfer Taxes | WIL may hire employees at the Purchased Restaurants; transfer taxes and fees borne equally; QIOR waives franchise transfer fees as to the sale to WIL (§ 7.9(k)). |

**Relief Requested**

22. By this Motion, the Debtors request entry of the Bidding Procedures Order:

a. approving the Bidding Procedures in connection with the sale or other disposition of all, substantially all, or any portion of the Debtors' assets (the "Assets"), including their restaurant Locations, in one or more transactions (each, a "Sale Transaction");

b. approving the designation of WIL as Stalking Horse Bidder for the Purchased Restaurants and the Purchased RE and authorizing the Debtors to designate one or more additional Stalking Horse Bidders and to provide the Bid Protections in accordance with the Bidding Procedures;

c. scheduling the Auction and the Sale Hearing;

d. approving the form and manner of notice of the Sale Transactions, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice");

e. approving procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption and Assignment Procedures"), including the form of notice to counterparties attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice" or "Cure Notice");

f. approving the form of Notice of Successful Bidder attached to the Bidding Procedures Order as **Exhibit 4**; and

g. granting related relief.

23. In addition, the Debtors request that, at the Sale Hearing, the Court enter one or more Sale Orders (a) approving the sale of the Assets to the Successful Bidder(s) free and clear of all liens, claims, encumbrances, and interests, with such interests attaching to the net proceeds of sale, with the net proceeds of each of the Prepetition Secured Lenders' collateral paid to such prepetition Secured Lender at closing; (b) authorizing the assumption and assignment of the

Proposed Assumed Contracts; (c) finding that each Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (d) approving the settlement and releases that may be embodied in the WIL Stalking Horse APA pursuant to Bankruptcy Rule 9019, to the extent applicable and not otherwise approved pursuant to the Debtors' separate motion under Bankruptcy Rule 9019; and (e) waiving the stays under Bankruptcy Rules 6004(h) and 6006(d).

## The Proposed Bidding Procedures

### A. Overview

24. The Bidding Procedures are designed to promote a competitive and expedient sale process that will allow the Debtors to solicit and identify the highest or otherwise best offer(s) for the Assets on a timeline consistent with the Cash Collateral Orders and the WIL Stalking Horse APA. Because the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated in their entirety here. Certain of the key terms are summarized below.[5]

### B. Summary of Material Terms

| Provision | Summary |
|---|---|
| Assets; Permitted Bid Structures (Art. 3) | All or any portion of the Debtors' right, title, and interest in each Location (restaurant, related real property interests, Leases, FF&E, inventory, permits, and other operating assets, listed on Schedule A) and other Assets, including owned real property, Contracts and Leases, intellectual property, and, subject to Article 18, the Debtors' rights under the Franchise Agreements. Bidders may submit Enterprise Bids, Partial Bids (including Lot Bids), or combinations, and may propose to operate Locations as franchised Wendy's restaurants, through Conversion Bids, or (for the Independent Concept Locations) as independent restaurants. |

[5] To the extent of any inconsistency between this summary and the Bidding Procedures, the Bidding Procedures shall control. Capitalized terms used in this section but not otherwise defined have the meanings given to them in the Bidding Procedures.

| Provision | Summary |
|---|---|
| Designated Lots (§ 3.3) | Initial marketing lots: the Purchased Restaurants; the 41 CT/MA Restaurants; the 11 NC Restaurants; the Purchased RE; the OCM Assets; and such other groupings as the Debtors determine. The Debtors and Old National may elect to sell the NC Restaurants by private sale outside the Auction upon notice. |
| Excluded Locations (§ 3.6) | The Tennessee Restaurants (subject to the separate Tennessee Sale), and the Designated Restaurants and Additional Designated Restaurants designated for closure with WIL's consent. |
| Allocation; Severability (§§ 3.4, 3.5) | Each Bid must allocate the purchase price among each Debtor entity or market, and separately to any Purchased RE and any OCM Assets. If a Bid omits an allocation or the allocation is unreasonable, the Debtors may determine the allocation, which will be disclosed to the Notice Parties and may be objected to at the Sale Hearing. Multi-Location Bids must state whether they are Severable Bids or All-or-Nothing (Package) Bids; Bids silent on the point are treated as All-or-Nothing Bids. |
| Participation Requirements (§§ 4.3, 4.4) | To become an Acceptable Bidder and receive diligence, a Potential Bidder must deliver to the Debtors' Advisors (a) an executed Confidentiality Agreement and (b) disclosure of the identity of the Potential Bidder and each of its principals. Only Acceptable Bidders may submit LOIs and Bids. |
| Due Diligence (Art. 5) | Data Room access for Acceptable Bidders, including Location-level financial information, Lease abstracts, the Form APA, and Franchisor Approval Materials. The Debtors may restrict competitively sensitive information or provide it on a clean-team basis. |
| Letters of Intent (Art. 6) | Non-binding Letters of Intent (each, an "LOI") are to be submitted to the Debtors' Advisors by the LOI Deadline (December 1, 2026, at 5:00 p.m.), addressing assets, indicative price and allocation, financing, franchise intentions, Leases, employees, contingencies, and interest in stalking horse designation. Each LOI should include the documentation required by the Franchisor for franchisee approval. Submission of an LOI is not a prerequisite to bidding, but the Debtors may prioritize diligence for parties that submit timely LOIs. |

| **Provision** | **Summary** |
|---|---|
| Stalking Horse Designation; Bid Protections (Art. 7) | In addition to WIL, the Debtors may designate additional Stalking Horse Bidders by the Stalking Horse Designation Deadline (December 7, 2026) and may offer a break-up fee and expense reimbursement in an aggregate amount not to exceed 3.0% of the cash purchase price (collectively, the "Bid Protections"). Bid Protections are payable only from the proceeds of an Alternative Transaction, as allowed administrative expenses under sections 503(b) and 507(a)(2), and are not payable from cash collateral or other collateral proceeds other than the proceeds of the Alternative Transaction. Ineligible to receive Bid Protections are WIL; any Prepetition Secured Lender that credit bids, absent the consent of the Debtors, the Committee, and the other Prepetition Secured Lenders; and insiders, absent further order of the Court. WIL may be asked to consider serving as Stalking Horse Bidder for the CT/MA Restaurants. A Stalking Horse Notice must be filed and served within one business day of execution; objections are due by the Stalking Horse Objection Deadline (December 9, 2026, at 5:00 p.m.). If no objection is timely filed, an order may be submitted under certification of counsel; if an objection is filed, the Court will hold a Stalking Horse Approval Hearing on not less than two business days' notice, expected to occur on December 11, 2026. |
| Bid Deadline (Art. 8) | December 11, 2026, at 5:00 p.m. (prevailing Eastern Time). |
| Bid Requirements (§ 9.1) | Among other things: identification of Assets by store number and address; purchase price and allocation; Good Faith Deposit of 10% of the Purchase Price (or of the cash component of a credit bid) delivered to Chicago Title as Escrow Agent; executed APA marked against the Form APA or applicable Stalking Horse APA; identification of Proposed Assumed Contracts and treatment of Cure Costs; Adequate Assurance Information; committed financing; no financing, diligence, or internal-approval contingencies; corporate authority; identity and insider disclosure; irrevocability through the Backup Bid Expiration Date (January 5, 2027); "as is, where is" acknowledgment and waiver of substantial contribution claims; Franchisor approval status and payment of Franchisor Cure Costs; employee, regulatory (including liquor licenses), and timing commitments; and consent to jurisdiction. |
| Qualified Bids; Aggregation (Art. 10) | The Debtors, in consultation with the Consultation Parties, determine Qualified Bids, may permit cure of deficiencies, may waive non-material requirements (but not the Good Faith Deposit absent lender consent or any Franchisor right), and may aggregate non-overlapping Partial Bids into Combination Bids. |

| Provision | Summary |
|---|---|
| Evaluation (Art. 11) | Bid Assessment Criteria include consideration, assumed liabilities and Cure Costs, number of Leases assumed, employees and WARN exposure, likelihood and timing of Franchisor approval, certainty of closing by the Outside Closing Date, the Residual Value/Cost Adjustment for unsold Locations, tax consequences, and Bid Protections. Enterprise and Partial Bids are compared on both "sum of the parts" and "consolidated" bases. Determinations of the highest or otherwise best bid are made in consultation with the Administrative Agent and the Committee (as to all Locations other than the NC Restaurants) and with Old National and the Committee (as to the NC Restaurants). The WIL Stalking Horse Bid is the Baseline Bid for the Purchased Restaurants and Purchased RE absent a higher or otherwise better Qualified Bid. |
| Credit Bidding (Art. 12) | Subject to section 363(k) and the Cash Collateral Orders, each Prepetition Secured Lender may credit bid only against its own collateral, subject to the Committee's challenge rights, and must include cash sufficient to pay (a) senior liens, (b) Bid Protections, (c) Cure Costs, (d) the price of non-collateral Assets, (e) transaction fees and costs (including those of Intrepid), and (f) amounts under approved budgets under the Cash Collateral Orders. Secured creditors other than the Administrative Agent that intend to credit bid must notify the Debtors by December 4, 2026, at 5:00 p.m. and provide documentation of their liens. A credit bidder is deemed a Qualified Bidder and must post a Good Faith Deposit only on the cash component of its bid. A credit bidder loses Consultation Party status as to the Assets subject to its bid. |
| Auction (Art. 13) | If two or more Qualified Bids are received for the same or overlapping Locations, an Auction will be held on December 17, 2026, at 10:00 a.m. at the offices of Barnes & Thornburg LLP, 171 Monroe Ave NW #1000, Grand Rapids, MI 49503, or virtually. Bidding will be open and transcribed; Minimum Overbid Increments will be set by the Debtors, in consultation with the Consultation Parties, prior to the Auction and may differ for Enterprise Bids and Partial Bids. The first Overbid on any Stalking Horse Locations must satisfy the Minimum Overbid. The Debtors may conduct Lot Rounds followed by a Combined Round. If only one Qualified Bid is received for any Location, the Debtors may, in consultation with the Consultation Parties, cancel the Auction as to such Location and designate such bid as the Successful Bid. |

| Provision | Summary |
|---|---|
| Successful and Backup Bidders (Art. 14) | Notice of Successful Bidder filed within one business day after the Auction; Successful Bidders must execute definitive documentation and supplement deposits to 10% within one business day. Backup Bids remain open through the Backup Bid Expiration Date (January 5, 2027), and the Backup Bidder's deposit will be returned within three business days after that date. Fiduciary out preserved. |
| Good Faith Deposits (Art. 15) | Held in escrow; Good Faith Deposits of Qualified Bidders not selected as Successful Bidder or Backup Bidder returned within three business days after the Auction; forfeited upon a Successful Bidder's default and treated as proceeds of the applicable collateral. The WIL Deposit is governed by Section 7.9(e). |
| Franchisor Matters (Art. 18) | Reservation of rights as to the Termination Notice and Franchisor Dispute; reinstatement of the applicable Franchise Agreements immediately prior to closing solely to effect the sale; QIOR consent rights and an expedited franchisee approval process; Franchisor communications with bidders; professional-eyes-only information sharing walled off from WIL; Conversion Bid requirements; and payment of Franchisor Cure Costs at closing. |
| Consultation Parties (Art. 19) | The Committee (including each of the members thereof, solely in their capacity as such); the Administrative Agent; Old National (solely as to its collateral and matters affecting Uncommon Hospitality, LLC); and Union Bank (as to the OCM Assets and any other collateral securing the Union Bank Loans), in each case through their counsel and advisors. A Consultation Party that submits a Bid loses Consultation Party status (§§ 12.5, 19.2). None of WIL, QIOR, or their affiliates is a Consultation Party. |
| Outside Closing Date (§ 1.4) | January 5, 2027, extendable only by written agreement of the Debtors, the Committee, WIL, QIOR, the Administrative Agent, and Old National; provided that any extension for a Sale Transaction that includes the OCM Assets also requires the consent of Union Bank. |

**C. Key Dates and Deadlines**

25. The Debtors propose the following key dates and deadlines (all times prevailing Eastern Time), which may be modified in accordance with Section 2.2 of the Bidding Procedures, provided that no modification shall result in the Sale Hearing being held, or the Sale Order being entered, after December 31, 2026 without the written consent of WIL:

| Event or Deadline | Date and Time (prevailing Eastern Time) |
|---|---|
| Filing of this Motion | November 12, 2026 |
| Marketing materials distributed and Data Room opens to parties under NDA | No later than November 20, 2026 |
| Execution of WIL Stalking Horse APA; Form APA posted to Data Room | No later than November 21, 2026 |
| Target entry of Bidding Procedures Order | November 24, 2026 |
| Service of Sale Notice | No later than November 30, 2026 (within three business days after entry of the Bidding Procedures Order) |
| Publication of Sale Notice (Nation's Restaurant News or comparable national publication) | Within three business days after service of the Sale Notice |
| Letter of Intent Deadline | December 1, 2026, at 5:00 p.m. |
| Filing and service of Assumption and Assignment Notice (Cure Notice) | December 4, 2026 |
| Deadline for secured creditors (other than the Administrative Agent) to notify the Debtors of intent to credit bid | December 4, 2026, at 5:00 p.m. |
| Stalking Horse Designation Deadline (Locations other than the Purchased Restaurants and Purchased RE) | December 7, 2026 |
| Stalking Horse Objection Deadline | December 9, 2026, at 5:00 p.m. |
| Stalking Horse Approval Hearing (if necessary) | December 11, 2026, at 10:00 a.m. |
| Bid Deadline | December 11, 2026, at 5:00 p.m. |
| Notification of Qualified Bidders | December 15, 2026 |
| Filing of Auction Notice | No later than December 15, 2026 |

| **Event or Deadline** | **Date and Time (prevailing Eastern Time)** |
|---|---|
| Deadline for WIL to deliver Excluded Store Notices | December 15, 2026 |
| Auction (if necessary) | December 17, 2026, at 10:00 a.m., at the offices of Barnes & Thornburg LLP, 171 Monroe Ave NW #1000, Grand Rapids, MI 49503, or virtually |
| Filing of Notice of Successful Bidder(s) | December 18, 2026 (within one business day after the close of the Auction) |
| Cure/Assignability Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Auction Objection Deadline and Adequate Assurance Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Sale Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Reply Deadline | December 28, 2026, at 12:00 p.m. |
| Sale Hearing | December 29, 2026, at 10:00 a.m. |
| Target entry of Sale Order | December 29, 2026 (and in any event no later than December 31, 2026) |
| Outside Closing Date | January 5, 2027 |
| Release of Backup Bidder | Earlier of closing with the Successful Bidder and the Outside Closing Date (January 5, 2027) |

26. The Debtors submit that the proposed timeline is reasonable and sufficient to permit a full and fair market test of the Assets. Indeed, the Debtors' marketing efforts are already underway. Intrepid has already commenced solicitation to Contact Parties. The Bidding Procedures provide Acceptable Bidders with Data Room access, management access, and site visits throughout the process. At the same time, the timeline reflects the Debtors' liquidity

constraints under the Cash Collateral Orders, the risk that franchised restaurant operations will deteriorate during a prolonged sale process, and the WIL milestones, under which the WIL Stalking Horse APA must be executed by November 21, 2026, the Sale Order entered by December 31, 2026, and closing achieved by January 5, 2027.

### D. Assumption and Assignment Procedures

27. To facilitate the Sale Transactions, the Debtors propose the following Assumption and Assignment Procedures, set forth in Article 17 of the Bidding Procedures:

a. **Cure Notice.** On or before December 4, 2026, the Debtors will file and serve on each counterparty to a Contract or Lease that may be assumed and assigned (each, a "Counterparty") the Cure Notice, which will identify the Contract or Lease, state the Debtors' calculation of Cure Costs, describe the objection procedures, and state that Adequate Assurance Information will be made available upon request on a confidential basis. Service of a Cure Notice is not an admission that any Contract or Lease is executory or will be assumed.

b. **Supplemental Cure Notices.** If the Debtors identify additional Contracts or Leases or modify any Cure Cost, they will serve a Supplemental Cure Notice, and the affected Counterparty will have fourteen days after service to object; provided that objections to Supplemental Cure Notices served after December 21, 2026 will, unless resolved, be treated as Adjourned Cure Objections and shall not delay the Sale Hearing or entry of a Sale Order.

c. **Cure/Assignability Objections.** Objections to Cure Costs or to assumption and assignment on any basis other than the adequate assurance of a Successful Bidder must be filed by the Cure/Assignability Objection Deadline (December 22, 2026, at 4:00 p.m. (prevailing Eastern Time)) and must state the cure amount asserted with supporting documentation.

d. **Adequate Assurance Objections.** Objections to the adequate assurance of future performance of a Successful Bidder must be filed by the Adequate Assurance Objection Deadline (December 22, 2026, at 4:00 p.m. (prevailing Eastern Time), except that adequate assurance objections as to a Stalking Horse Bidder are due by the Cure/Assignability Objection Deadline.

e. **Resolution; Adjourned Cure Objections.** Unresolved objections will be heard at the Sale Hearing or, at the Debtors' election, at a later date. Where an objection relates solely to Cure Costs, the Contract or Lease may be assumed and assigned at closing provided that the disputed amount is reserved in cash by the Debtors or the Successful Bidder pending resolution.

f. **Failure to Object.** A Counterparty that fails to timely object will be forever barred from objecting to the Cure Costs or asserting additional cure or other amounts against the Debtors, the Successful Bidder, or their property, and will be deemed to have consented to the assumption and assignment, including for purposes of section 365(c)(1) of the Bankruptcy Code.

g. **Designation Rights; Landlord Rights.** A Successful Bidder may add or remove Proposed Assumed Contracts prior to closing in accordance with its definitive agreement; any removal shall be effective upon notice to the affected Counterparty, any removed Contract or Lease shall not be assumed, and the Debtors reserve all rights with respect thereto. Nothing in the procedures waives any landlord right under sections 365(b)(3) or 365(d)(3) of the Bankruptcy Code, the right to object to a change of use or concept, or the right to object to a sale free and clear of an interest arising under a Lease.

## Proposed Notice Procedures

28. **Sale Notice.** Within three business days after entry of the Bidding Procedures Order, the Debtors propose to file the Sale Notice and serve the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures by first-class mail or, where available, electronic mail on: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the Administrative Agent; (d) counsel to Old National; (e) counsel to Union Bank; (f) QIOR, as Franchisor, and its counsel; (g) WIL and its counsel; (h) all Contact Parties and all parties known to have expressed an interest in acquiring the Assets within the past twelve months; (i) all entities known to have asserted any lien, claim, encumbrance, or interest in the Assets; (j) all Counterparties to the Debtors' Contracts and Leases; (k) the Internal Revenue Service and all applicable federal, state, and local taxing and regulatory authorities, including liquor licensing authorities in Michigan; (l) the United States Attorney for the Western District of Michigan; (m) the attorneys general for the states in which the Debtors operate; (n) the Antitrust Division of the United States Department of Justice and the Federal Trade Commission; and (o) all parties that have requested notice pursuant

to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties"). The Debtors will also serve the Sale Notice on all parties on the creditor matrix.

29. **Publication Notice.** Within three business days after service of the Sale Notice, the Debtors will cause the Sale Notice, modified for publication as necessary, to be published once in *Nation's Restaurant News* or a comparable national publication, which the Debtors submit is sufficient notice to unknown parties in interest.

30. **Cure Notice.** The Debtors will file and serve the Cure Notice and any Supplemental Cure Notice on each affected Counterparty in accordance with the Assumption and Assignment Procedures.

31. **Stalking Horse Notice; Auction Notice; Notice of Successful Bidder.** The Debtors will file and serve (a) any Stalking Horse Notice within one business day after executing a Stalking Horse APA on the Notice Parties, the Franchisor, affected landlords and Counterparties, and all parties that have executed a Confidentiality Agreement; (b) no later than December 15, 2026, the Auction Notice, stating the location and format of the Auction, the Locations and Designated Lots to be auctioned, and whether the Auction will be conducted in multiple sessions, or a notice of cancellation of the Auction; and (c) the Notice of Successful Bidder, substantially in the form of Exhibit 4 to the Bidding Procedures Order, within one business day after the close of the Auction, on the Notice Parties, the Franchisor, and all affected Counterparties, which notice will identify the Successful Bidder(s) and Backup Bidder(s), the applicable Locations, the Purchase Price and its allocation, and the Proposed Assumed Contracts, and will attach the applicable definitive agreement and proposed Sale Order.

32. Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and all related notices will also be posted free of charge on the website maintained by Kroll Restructuring Administration at https://restructuring.ra.kroll.com/meritage.

33. Bankruptcy Rule 2002(a)(2) requires 21 days' notice of a proposed sale of property outside the ordinary course of business, and Bankruptcy Rule 2002(c)(1) requires that such notice include the time and place of any auction, the terms and conditions of any private sale, and the deadline for filing objections. The Debtors submit that the Sale Notice, which will be served more than 21 days before the Sale Hearing, satisfies these requirements and constitutes good and sufficient notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale Transactions, and that no other or further notice is required.

## Basis for Relief

### A. The Bidding Procedures Are a Sound Exercise of the Debtors' Business Judgment and Should Be Approved.

34. Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although section 363 does not specify a standard for approving such a sale, courts approve a debtor's sale of assets outside the ordinary course of business where the debtor demonstrates "some articulated business justification." *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983). The Sixth Circuit has expressly adopted *Lionel*, holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *accord Matter of Embrace Sys. Corp.*, 178 B.R. 112, 124 (Bankr. W.D. Mich. 1995); *In re Salem Pointe Capital, LLC*, No. 3:24-bk-31702-SHB, 2026 WL 3073615, at *13 (Bankr. E.D. Tenn. Oct. 13, 2026).

35. The decision "falls within the sound discretion of the trial court," which "should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)." *Stephens*, 789 F.2d at 388 (citations omitted). Once the debtor articulates a valid business justification, "[t]he business judgment rule . . . 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).

36. In applying this standard, the Sixth Circuit has endorsed the non-exclusive factors identified in *Lionel*, including "the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value." *Stephens*, 789 F.2d at 389 (quoting *Lionel*, 722 F.2d at 1071). These factors provide guidance rather than a checklist, and the court "must consider the unique facts and circumstances of each case as opposed to applying a 'predetermined formula.'" *In re Family Christian, LLC*, 533 B.R. 600, 626 (Bankr. W.D. Mich. 2015) (quoting *Embrace*, 178 B.R. at 125). Courts in this Circuit also consider whether adequate and reasonable notice has been provided, whether the sale price is fair and reasonable, and whether the proposed buyer is proceeding in good faith. *Family Christian*, 533 B.R. at 626; *Salem Pointe*, 2026 WL 3073615, at *14.

37. Throughout, "[w]hen a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." *Embrace*, 178 B.R. at 123 (citation omitted); *accord Family Christian*, 533 B.R. at 627. A debtor's fiduciary duty to maximize value "does not require the [d]ebtors to mechanically accept a bid with the highest dollar amount"; debtors "are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *Family Christian*, 533 B.R. at 622. Procedures that encourage competitive bidding and permit a debtor to weigh such factors are therefore consistent with the goal of maximizing value.

38. The Bidding Procedures satisfy these standards. They establish an open, fair, and competitive process with clear participation and bid requirements, give bidders flexibility to bid on the enterprise, on Designated Lots, or on individual Locations, and equip the Debtors and the Consultation Parties with transparent criteria to assess bids and a structured method for comparing enterprise and partial bids. The resulting market check will establish that the consideration ultimately obtained is fair and reasonable.

39. Each of the relevant *Stephens* and *Lionel* factors supports approval. First, and "most importantly perhaps," the Debtors' franchised restaurant operations are a wasting asset: revenue and same-store sales have been challenging over the last few months, the Debtors are operating under the constraints of the Cash Collateral Orders, and franchised restaurant operations are particularly susceptible to employee attrition, vendor and landlord uncertainty, and deferred capital and reimaging obligations during a prolonged process. Courts in this Circuit have found a sound business purpose where delay threatens the value of the very assets being sold. *See Stephens*, 789 F.2d at 390; *Family Christian*, 533 B.R. at 627–28 (declining asset values and looming liquidity

crisis supported a sale); *Salem Pointe*, 2026 WL 3073615, at *16–17.* Second*,* the Bidding Procedures contemplate a robust postpetition marketing process building on the Debtors' prepetition portfolio optimization efforts. *See Family Christian,* 533 B.R. at 628. Third*,* the WIL Stalking Horse Bid provides a floor of $45,918,000 in net cash base consideration for the Purchased Restaurants and $6,000,000 for the Purchased RE, without bid protections, and is coupled with a global resolution of the Termination Notice and the Franchisor Dispute. Fourth, absent a sale process that resolves the Franchisor Dispute and preserves Wendy's operations as a going concern, the Debtors face the prospect of protracted litigation over the effectiveness of the Termination Notice and an asserted claim of approximately $146.9 million.

**B. The Designation of WIL as Stalking Horse Bidder and the Procedures for Designating Additional Stalking Horse Bidders and Providing Bid Protections Are Reasonable.**

40. The designation of WIL as Stalking Horse Bidder for the Purchased Restaurants and the Purchased RE is a sound exercise of the Debtors' business judgment. The WIL Stalking Horse Bid sets a floor price that can be tested in the marketplace, imposes no break-up fee or expense reimbursement on the estates, and is accompanied by a $2,000,000 deposit. The WIL Stalking Horse Bid also delivers benefits beyond the purchase price, including QIOR's consent to the sale of the CT/MA Restaurants and NC Restaurants through the Auction, the reinstatement of the applicable Franchise Agreements to effectuate sales, the waiver of franchise transfer fees as to the sale to WIL, and the dismissal of the Termination Litigation and exchange of mutual releases upon consummation.

41. The Debtors also request authority to designate additional Stalking Horse Bidders for other Locations and to offer limited Bid Protections. Courts review bid protections under the debtor's business judgment, considering whether the payment is tainted by self-dealing and whether it is reasonable relative to the purchase price. *See In re JW Res., Inc.*, 536 B.R. 193, 195

(Bankr. E.D. Ky. 2015); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). The proposed Bid Protections satisfy that standard: they consist of a break-up fee and expense reimbursement capped in the aggregate at 3.0% of the cash purchase price; are payable only upon consummation of an Alternative Transaction and solely from its proceeds, and not from cash collateral or other collateral proceeds; are unavailable to WIL, to any Prepetition Secured Lender that credit bids (absent the consent of the Debtors, the Committee, and the other Prepetitoin Secured Lender) and to insiders (absent further order of the Court); and are subject to the Stalking Horse Notice and objection procedures, including a Stalking Horse Objection Deadline of December 9, 2026, at 5:00 p.m. and, if an objection is filed, a Stalking Horse Approval Hearing on not less than two business days' notice, which afford parties in interest an opportunity to be heard before any Bid Protections are approved. If payable, the Bid Protections should be allowed as administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

**C. The Sale Should Be Approved Free and Clear Under Section 363(f) of the Bankruptcy Code.**

42. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of any interest in such property if (i) applicable non-bankruptcy law permits such a sale; (ii) such entity consents; (iii) such interest is a lien and the price is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f). Because section 363(f) is stated in the disjunctive, "the Court need find only one of the five subsections applicable." *Salem Pointe*, 2026 WL 3073615, at *15; see also In re Nature Leisure Times, LLC,* No. 06-41357, 2007 WL 4554276, at 3 (Bankr. E.D. Tex. Dec. 19, 2007).

43. The Court may authorize a sale free and clear pursuant to sections 105(a) and 363(f) of the Bankruptcy Code. *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y.



40449964.3

2019); *In re AutoStyle Plastics, Inc.*, 227 B.R. 797, 800 (Bankr. W.D. Mich. 1998) (bankruptcy courts may approve sales free and clear "either through 11 U.S.C. § 363(f) or the bankruptcy court's equitable powers"); *Al Perry Enters., Inc. v. Appalachian Fuels, LLC*, 503 F.3d 538, 543 (6th Cir. 2007) (bankruptcy court "has clear power to approve the sale of debtors' assets free and clear of any interest or claims that could be brought against the bankrupt estate during bankruptcy pursuant to 11 U.S.C. § 363(f)"). A party that receives notice and fails to object is deemed to consent. *See Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *AutoStyle*, 227 B.R. at 799–801.

44. The Debtors anticipate that one or more of the section 363(f) conditions will be satisfied as to each Sale Transaction. Among other things, the Prepetition Secured Lenders may consent under section 363(f)(2), the Bidding Procedures require allocation of the purchase price among each Debtor entity or market and separately to any Purchased RE and any OCM Assets, and all liens will attach to the net proceeds with the same validity, priority, and extent as existed immediately prior to the sale, subject to the Cash Collateral Orders (and subject to the Committee's challenge rights). *See Stephens*, 789 F.2d at 391 (lien on sale proceeds protects secured creditor's claim).[6]

45. The Court should also find that the Successful Bidder(s) have no liability for any liabilities not expressly assumed, including under any theory of successor liability. A sale "free and clear of all liens, claims and encumbrances" extinguishes a creditor's prepetition claim "unless it was expressly assumed by [the purchaser] as part of the purchase agreement." *Al Perry*, 503 F.3d at 541. Likewise, "a bankruptcy court sale free and clear of liens, claims and interests bars

[6] To the extent the Franchisor asserts interests arising under the Franchise Agreements or the Termination Notice, such interests are in bona fide dispute within the meaning of section 363(f)(4), subject to the reservation of rights in Article 18 of the Bidding Procedures.

successor liability claims." *AutoStyle*, 227 B.R. at 800 (citing *In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987)). Because all known creditors and parties asserting interests in the Assets will receive notice, any party contending that a purchaser should be liable for an obligation of the Debtors must raise that contention by timely objection. *See Al Perry*, 503 F.3d at 542–43.

**D. The Successful Bidder(s) Should Be Afforded the Protections of Sections 363(m) and 363(n) of the Bankruptcy Code.**

46. Section 363(m) of the Bankruptcy Code protects a purchaser who buys property in good faith from the reversal or modification on appeal of the authorization of the sale, unless the authorization and sale were stayed pending appeal. A good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *In re Made In Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005) (following *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)). The requirement "speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings," and a lack of good faith requires a showing of "fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted an attempt to take grossly unfair advantage of other bidders." *Id.* (quoting *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza)*, 100 F.3d 1214, 1218 (6th Cir. 1996)). Courts consider "(1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the [debtor] holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or collusion exists among the prospective purchaser, any other bidders or the trustee." *Salem Pointe*, 2026 WL 3073615, at *15 (quoting In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 235 (Bankr. S.D. Ohio 2008)). The court should make an express finding as to the purchaser's good faith. *Embrace*, 178 B.R. at 126.

47. The Bidding Procedures are designed to produce a fair, transparent, and competitive process under the facts and circumstances of the Debtors' Chapter 11 Cases. They require full disclosure of each bidder's identity, insider status, and agreements with insiders, management, the Prepetition Secured Lenders, or the Franchisor; prohibit collusion and require each Qualified Bidder to confirm on the record that it has not colluded; and wall off information provided to QIOR from WIL. Because QIOR is an affiliate of WIL, the Bidding Procedures restrict the use of competing-bidder information provided to QIOR or its counsel solely to the franchisee approval process. The Debtors will be prepared to demonstrate at the Sale Hearing that each Successful Bidder is a good faith purchaser and that the parties have not engaged in any conduct that would permit the sale to be avoided under section 363(n), and will request findings to that effect in the Sale Order.

### E. The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved Under Section 365 of the Bankruptcy Code.

48. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). An executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *AutoStyle*, 227 B.R. at 801 (quoting *In re Jolly*, 574 F.2d 349 (6th Cir. 1978)). Courts apply the business judgment standard in determining whether to approve a debtor's assumption of an executory contract or unexpired lease. Under section 365(b)(1), any defaults must be cured, or adequate assurance of prompt cure provided, at the time of assumption, and section 365(f)(2) permits assignment if the debtor assumes the contract and adequate assurance of future performance by the assignee is provided.

49. Adequate assurance of future performance is determined "by the facts and circumstances of each case," and the assignee "need not provide an absolute guarantee of performance." *Salem Pointe*, 2026 WL 3073615, at *17 (quoting Androse Assocs. of Allaire, LLC v. Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac. Tea Co.)*, 472 B.R. 666, 674 (S.D.N.Y. 2012)); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance "does not mean absolute insurance that the [d]ebtor will thrive and make a profit").

50. The Debtors' restaurant premises Leases are expected to constitute a principal component of the value of many Locations, and the assumption and assignment of the Proposed Assumed Contracts is integral to any Sale Transaction. The Bidding Procedures require each Bid to identify Proposed Assumed Contracts, state the treatment of Cure Costs, and include detailed Adequate Assurance Information, including financial statements, restaurant operating experience, and the proposed use of each leased premises, which will be made available to Counterparties on a confidential basis. The Debtors will adduce evidence of adequate assurance at the Sale Hearing as necessary, and the Assumption and Assignment Procedures afford each Counterparty notice and an opportunity to object.

51. The Debtors further request that, pursuant to sections 365(e) and 365(f) of the Bankruptcy Code, any provision of a Proposed Assumed Contract that prohibits, restricts, or conditions its assignment (including any consent requirement, right of first refusal or recapture, change-of-control, anti-assignment, or ipso facto provision) be deemed unenforceable in connection with the assumption and assignment; that, pursuant to section 365(f)(3), no Counterparty may charge any rent acceleration, assignment fee, or similar charge on account of the assignment; and that, pursuant to section 365(k), the Debtors and their estates be relieved of liability for any breach occurring after assignment. Counterparties that fail to timely object should

be deemed to consent, including for purposes of sections 365(c)(1)(B) and 365(e)(2)(A)(ii) of the Bankruptcy Code. *See Hargrave*, 175 B.R. at 858.

52. Finally, to the extent the number of Contracts and Leases addressed by this Motion exceeds the limit set forth in Bankruptcy Rule 6006(f)(6), the Debtors request that the Court excuse such limit, as the Contracts and Leases are of substantially similar types and requiring separate motions would not advance the process. *See Salem Pointe*, 2026 WL 3073615, at 23 (finding substantial compliance with Rule 6006(f) and following *In re Old Carco LLC*, 406 B.R. 180, 210 (Bankr. S.D.N.Y. 2009)).

**F. The Proposed Notice Procedures Are Appropriate.**

53. The Sale Notice, the Cure Notice, the Stalking Horse Notice, the Auction Notice, and the Notice of Successful Bidder are reasonably calculated to provide all known and unknown parties in interest with timely and adequate notice of the Bidding Procedures, the Auction, the Sale Hearing, the objection deadlines, and the proposed assumption and assignment of Contracts and Leases. The notice procedures comply with Bankruptcy Rules 2002, 6004, and 6006 and the Local Rules and should be approved.

**G. The Court Should Waive the Stays Under Bankruptcy Rules 6004(h) and 6006(d).**

54. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) similarly stays for 14 days an order authorizing the assignment of an executory contract or unexpired lease. Fed. R. Bankr. P. 6006(d). Time is of the essence: the WIL Stalking Horse APA requires entry of a Sale Order by December 31, 2026 and closing by January 5, 2027, and any delay risks the loss of the WIL Stalking Horse Bid and further deterioration of the Debtors' operations. The Debtors therefore request that the Bidding Procedures Order and any Sale Order be effective immediately upon entry.

**Notice**

55. The Debtors will provide notice of this Motion to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the Administrative Agent; (d) counsel to Old National; (e) counsel to Union Bank; (f) QIOR and its counsel; (g) WIL and its counsel; (h) all entities known to have asserted any lien, claim, encumbrance, or interest in the Assets; (i) all Counterparties to the Debtors' Contracts and Leases; (j) the Internal Revenue Service and applicable taxing authorities; (k) the United States Attorney for the Western District of Michigan; (l) the attorneys general for the states in which the Debtors operate; (m) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (n) all parties on the Debtors' Creditors Matrix. The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

**No Prior Request**

56. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A; (ii) following the Sale Hearing, enter one or more Sale Orders approving the Sale Transactions free and clear of all liens, claims, encumbrances, and interests and authorizing the assumption and assignment of the Proposed Assumed Contracts; and (iii) grant such other and further relief as the Court deems just and proper.

Dated: November 12, 2026

Respectfully submitted,

*/s/Scott N. Opincar*

MCDONALD HOPKINS LLC
Scott N. Opincar
Michael J. Kaczka
Maria G. Carr (admitted *pro hac vice*)
600 Superior Ave. East, Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Email: sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com
mcarr@mcdonaldhopkins.com

*Counsel for the Debtors and Debtors in Possession*