**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MERITAGE HOSPITALITY GROUP INC., *et al.*,[1] | ) | Case No. 26-02947 (JWB) |
| Debtors. | ) | (Jointly Administered) |

**ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS; (II) AUTHORIZING THE DEBTORS TO DESIGNATE ONE OR MORE STALKING HORSE BIDDERS AND TO PROVIDE BID PROTECTIONS; (III) SCHEDULING AN AUCTION AND SALE HEARING; (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (V) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (i) approving the Bidding Procedures attached hereto as **Exhibit 1**; (ii) approving the designation of WIL as Stalking Horse Bidder for the Purchased Restaurants and the Purchased RE and authorizing the Debtors to designate additional Stalking Horse Bidders and provide Bid Protections; (iii) scheduling the Auction and the Sale Hearing; (iv) approving the form and manner of notice thereof, including the Sale Notice attached hereto as **Exhibit 2**, the Assumption and Assignment Notice attached hereto as **Exhibit 3**, and the Notice of Successful Bidder attached hereto as **Exhibit 4**; (v) approving the Assumption and Assignment Procedures; and (vi) granting related relief, all as more fully set forth

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Meritage Hospitality Group Inc. (0460); MHG Food Service, Inc. (5926); OCM Development, LLC (7384); Wen Carolinas, LLC (3792); Wen Georgia, LLC (7369); Wen Ohio, LLC (5959); Wen Oklahoma, LLC (8802); Wen South, LLC (1229); Wen Tennessee, LLC (2477); Wen Virginia, LLC (2840); WM Limited Partnership-1998 (9989); RES Management, LLC (9105); Inspired By Opportunity, LLC (3681); Uncommon Hospitality, LLC (8858); and Chicken Ventures, LLC (7215). The corporate headquarters and the mailing address for the Debtors is 45 Ottawa Ave SW Suite 600, Grand Rapids, MI 49503.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

in the Motion; and the Court having jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and the Court having held a hearing on the Motion on November 24, 2026 in Grand Rapids, Michigan (the "Bidding Procedures Hearing"); and all objections, if any, having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014. To the extent any finding of fact constitutes a conclusion of law, it is adopted as such, and vice versa.

B. Notice of the Motion and the Bidding Procedures Hearing was adequate and sufficient under the circumstances and complied with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is required.

C. The Debtors have articulated good and sufficient business reasons for the Court to approve the Bidding Procedures, the designation of WIL as Stalking Horse Bidder, the procedures for designating additional Stalking Horse Bidders and providing Bid Protections, the Assumption and Assignment Procedures, and the form and manner of the notices described herein.

D. The Bidding Procedures were negotiated in good faith and at arm's length, are fair, reasonable, and appropriate, and are designed to maximize the value of the Assets for the benefit of the Debtors' estates, their creditors, and all parties in interest.

E. The Sale Notice, the Assumption and Assignment Notice, the Stalking Horse Notice, the Auction Notice, and the Notice of Successful Bidder are reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction, the Sale Hearing, the Sale Transactions, and the proposed assumption and assignment of Contracts and Leases, and no other or further notice is required.

**IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED as set forth herein.

2. All objections to the relief granted herein that have not been withdrawn, waived, or settled are overruled on the merits.

**A. Bidding Procedures**

3. The Bidding Procedures attached hereto as **Exhibit 1** are approved in their entirety and incorporated herein by reference. The failure to specifically reference any provision of the Bidding Procedures in this Order shall not impair the effectiveness of such provision. The Debtors are authorized to take all actions reasonably necessary to implement the Bidding Procedures.

4. The Debtors may modify the Key Dates and the Bidding Procedures only in accordance with Sections 2.2 and 21.1 of the Bidding Procedures; *provided* that no modification shall result in the Sale Hearing being held, or a Sale Order being entered, after December 31, 2026 without the written consent of WIL.

5. The Outside Closing Date shall be January 5, 2027, which may be extended only in accordance with Section 1.4 of the Bidding Procedures by written consent of the Debtors, the Committee, WIL, QIOR, the Administrative Agent, and Old National (and, solely with respect to the OCM Assets, Union Bank).

6. The deadline to submit Bids is **December 11, 2026, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"). The deadline to submit non-binding letters of intent is

December 1, 2026, at 5:00 p.m. (prevailing Eastern Time) (the "LOI Deadline"); submission of a letter of intent is not a prerequisite to submitting a Bid. The Debtors shall notify Acceptable Bidders whether their Bids constitute Qualified Bids by December 15, 2026.

**B. Stalking Horse Bidders and Bid Protections**

7. Upon execution of the WIL Stalking Horse APA, WIL is designated as the Stalking Horse Bidder for the Purchased Restaurants and the Purchased RE, and WIL shall be deemed a Qualified Bidder and the WIL Stalking Horse Bid a Qualified Bid for all purposes, on the terms set forth in Section 7.9 of the Bidding Procedures. WIL shall not be entitled to any Bid Protections, break-up fee, or expense reimbursement. WIL's deposit shall constitute the WIL Deposit and shall be governed by Section 7.9(e) of the Bidding Procedures. If the WIL Stalking Horse APA is not executed on or before November 21, 2026, the Debtors shall file a notice to that effect.

8. The Debtors are authorized, in consultation with the Consultation Parties, to designate one or more additional Stalking Horse Bidders by December 7, 2026 (the "Stalking Horse Designation Deadline") and to offer Bid Protections not to exceed, in the aggregate, 3.0% of the cash purchase price, as set forth in Section 7.2 of the Bidding Procedures. The Debtors shall file and serve a Stalking Horse Notice in accordance with Section 7.5 of the Bidding Procedures. Objections to any such designation or Bid Protections must be filed and served no later than December 9, 2026, at 5:00 p.m. (prevailing Eastern Time) (the "Stalking Horse Objection Deadline"). If no timely objection is filed, the Debtors may submit a proposed order under certification of counsel, which the Court may enter without further hearing; if a timely objection is filed and not resolved, the Court will hold a hearing on not less than two business days' notice, which is expected to be held on December 11, 2026, at 10:00 a.m. (prevailing Eastern Time), subject to the Court's availability (the "Stalking Horse Approval Hearing"). The designation of

WIL as Stalking Horse Bidder is approved by this Order and is not subject to the objection procedures set forth in this paragraph.

9. Any Bid Protections approved by further order of the Court shall be payable solely from the proceeds of an Alternative Transaction at the closing thereof, shall not be payable from cash collateral or any other proceeds of the Prepetition Secured Lenders' collateral other than the proceeds of such Alternative Transaction, and shall constitute allowed administrative expense claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code. No insider of the Debtors shall be eligible for Bid Protections absent further order of the Court. No party other than an approved Stalking Horse Bidder (other than WIL) shall be entitled to any break-up fee, expense reimbursement, termination fee, or similar payment, and any substantial contribution claim by any Bidder relating to the Sale Process is deemed waived.

**C. Credit Bidding**

10. Subject to section 363(k) of the Bankruptcy Code, the Cash Collateral Orders, and Article 12 of the Bidding Procedures, each Prepetition Secured Lender may credit bid all or any portion of its allowed secured claims solely with respect to Assets constituting its collateral. Any secured creditor other than the Administrative Agent that intends to credit bid must notify the Debtors in writing of such intent by December 4, 2026, at 5:00 p.m. (prevailing Eastern Time). Any credit bid shall be subject to the challenge rights of the Committee and other parties in interest under the Cash Collateral Orders, and subject to the rights of the Committee and other parties in interest to object to, seek to limit, or contest such credit bid for "cause" pursuant to section 363(k) of the Bankruptcy Code.

### D. Auction and Sale Hearing

11. If the Debtors receive two or more Qualified Bids for the same or overlapping Locations, the Auction shall commence on December 17, 2026, at 10:00 a.m. (prevailing Eastern Time) at the offices of Barnes & Thornburg LLP, 171 Monroe Ave NW #1000, Grand Rapids, MI 49503, or virtually by video conference, as set forth in the Auction Notice. The Debtors shall file the Auction Notice (or a notice of cancellation of the Auction) no later than December 15, 2026. The Auction shall be conducted openly and transcribed or video recorded, and each Qualified Bidder shall confirm on the record that it has not engaged in any collusion.

12. The Sale Hearing shall be held before the Honorable James W. Boyd, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Western District of Michigan, One Division Ave. N., Grand Rapids, Michigan 49503, on **December 29, 2026, at 10:00 a.m. (prevailing Eastern Time)**. The Sale Hearing may be adjourned in accordance with Section 16.1 of the Bidding Procedures; *provided* that no adjournment shall result in a Sale Order being entered after December 31, 2026 without the written consent of WIL.

13. Objections to the relief requested in the Motion, including the sale of the Assets free and clear of liens, claims, encumbrances, and interests, must be filed and served on the Notice Parties by December 22, 2026, at 4:00 p.m. (prevailing Eastern Time) (the "Sale Objection Deadline"). Objections solely to the conduct of the Auction, the identity of any Successful Bidder, or the terms of any Successful Bid (other than adequate assurance) must be filed by December 22, 2026, at 4:00 p.m. (prevailing Eastern Time) (the "Auction Objection Deadline"). Replies may be filed by December 28, 2026, at 12:00 p.m. (prevailing Eastern Time) (the "Reply Deadline").

14. Each objection must (a) be in writing; (b) state with particularity the legal and factual basis therefor; (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed

with the Court and served on the Notice Parties. Any party that fails to timely file and serve an objection shall be forever barred from asserting such objection and shall be deemed to consent to the sale of the Assets free and clear for purposes of section 363(f)(2) of the Bankruptcy Code.

**E. Assumption and Assignment Procedures**

15. The Assumption and Assignment Procedures set forth in Article 17 of the Bidding Procedures and the form of Assumption and Assignment Notice attached hereto as **Exhibit 3** are approved. The Debtors shall file and serve the Assumption and Assignment Notice on each Counterparty on or before December 4, 2026.

16. Cure/Assignability Objections must be filed and served by December 22, 2026, at 4:00 p.m. (prevailing Eastern Time) (the "Cure/Assignability Objection Deadline"); Adequate Assurance Objections as to a Stalking Horse Bidder must be filed and served by the Cure/Assignability Objection Deadline; and Adequate Assurance Objections as to a Successful Bidder (other than a Stalking Horse Bidder) must be filed and served by December 22, 2026, at 4:00 p.m. (prevailing Eastern Time) (the "Adequate Assurance Objection Deadline"). Counterparties served with a Supplemental Cure Notice shall have fourteen days after service to object; *provided* that any objection to a Supplemental Cure Notice served after December 21, 2026 shall, unless resolved, be treated as an Adjourned Cure Objection and shall not delay the Sale Hearing or entry of a Sale Order.

17. Any Counterparty that fails to timely object shall be (a) forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, the Successful Bidder, or the property of either, and (b) deemed to have consented to the assumption and assignment of its Contract or Lease, including for purposes of section 365(c)(1) of the Bankruptcy Code. Inclusion of a Contract or Lease on an Assumption and Assignment

Notice shall not constitute an admission that it is executory or unexpired or obligate the Debtors to assume it.

**F. Notice Procedures**

18. The Sale Notice attached hereto as **Exhibit 2** is approved. Within three business days after entry of this Order, the Debtors shall file the Sale Notice and serve the Sale Notice, this Order, and the Bidding Procedures on the Sale Notice Parties and the creditor matrix, and within three business days thereafter shall cause the Sale Notice to be published once in *Nation's Restaurant News* or a comparable national publication. The Notice of Successful Bidder attached hereto as **Exhibit 4** is approved, and the Debtors shall file and serve the Notice of Successful Bidder within one business day after the close of the Auction on the Notice Parties, the Franchisor, and all affected Counterparties.

19. Service of the notices as set forth herein constitutes good and sufficient notice of the Bidding Procedures, the Auction, the Sale Hearing, the Sale Transactions, and the Assumption and Assignment Procedures, and no other or further notice is required.

**G. Franchisor Matters and Reservation of Rights**

20. Except as expressly provided in Section 18.1 of the Bidding Procedures, nothing in this Order, the Bidding Procedures, or any notice or action taken hereunder (a) constitutes a determination by the Court or an admission by any party regarding the status, effectiveness, termination, assumability, or assignability of any Franchise Agreement, the validity or effect of the Termination Notice, or the amount of any claim or Cure Cost asserted by the Franchisor; or (b) waives, impairs, or prejudices any right, claim, defense, or argument of the Debtors, the Administrative Agent, Old National, the Committee, or Franchisor with respect thereto, all of which are expressly reserved. Information provided to QIOR or its counsel regarding competing

Bidders shall be used solely for purposes of the franchisee approval process and shall not be shared with WIL or with any personnel or advisors involved in the WIL Stalking Horse Bid.

21. Nothing in this Order impairs the rights of the Committee (including its challenge rights under the Cash Collateral Orders), the Prepetition Secured Lenders, any landlord or Counterparty, or the U.S. Trustee, as provided in Article 21 of the Bidding Procedures.

**H. Miscellaneous**

22. All Bidders shall be deemed to have consented to the core jurisdiction of the Court, waived any right to a jury trial, and consented to entry of final orders by the Court with respect to the Bidding Procedures, the Auction, and any Sale Transaction.

23. In the event of any inconsistency between this Order and the Bidding Procedures, this Order shall govern.

24. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), or otherwise, this Order shall be effective and enforceable immediately upon entry.

25. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

26. The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order and the Bidding Procedures.

**END OF ORDER**

*Order prepared and submitted by:*

**MCDONALD HOPKINS LLC**
Scott N. Opincar
Michael J. Kaczka
Maria G. Carr (admitted *pro hac vice*)
600 Superior Ave. East, Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Email: sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com
mcarr@mcdonaldhopkins.com

*Counsel for the Debtors*
*and Debtors in Possession*

# EXHIBIT 1

## Bidding Procedures

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MERITAGE HOSPITALITY GROUP INC., *et al.*,[1] | ) | Case No. 26-02947 (JWB) |
| Debtors. | ) | (Jointly Administered) |

# BIDDING PROCEDURES

On September 17, 2026 (the "Petition Date"), Meritage Hospitality Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Western District of Michigan (the "Court"). The Debtors' chapter 11 cases (the "Chapter 11 Cases") are being jointly administered under the caption above. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On [________], [•], 2026, the Court entered the *Order (I) Approving Bidding Procedures in Connection with the Sale of the Debtors' Assets; (II) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections; (III) Scheduling an Auction and Sale Hearing; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (VI) Granting Related Relief* [Docket No. [•]] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures (these "Bidding Procedures").

These Bidding Procedures set forth the process by which the Debtors are authorized to solicit, receive, and evaluate offers for, and, if applicable, conduct an auction (the "Auction") with respect to, the sale or other disposition of all, substantially all, or any portion of the Debtors' assets, including their restaurant Locations (as defined in Section 3.1), in one or more transactions (each, a "Sale Transaction") pursuant to section 363 of the Bankruptcy Code or otherwise. For the avoidance of doubt, the Debtors, in consultation with the Consultation Parties (which are: (a) the Committee (including each of the members thereof, solely in their capacity as such); (b) the Administrative Agent; (c) Old National, solely with respect to its collateral and matters affecting

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Meritage Hospitality Group Inc. (0460); MHG Food Service, Inc. (5926); OCM Development, LLC (7384); Wen Carolinas, LLC (3792); Wen Georgia, LLC (7369); Wen Ohio, LLC (5959); Wen Oklahoma, LLC (8802); Wen South, LLC (1229); Wen Tennessee, LLC (2477); Wen Virginia, LLC (2840); WM Limited Partnership-1998 (9989); RES Management, LLC (9105); Inspired By Opportunity, LLC (3681); Uncommon Hospitality, LLC (8858); and Chicken Ventures, LLC (7215). The corporate headquarters and the mailing address for the Debtors is 45 Ottawa Ave SW Suite 600, Grand Rapids, MI 49503.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Order or the motion seeking entry thereof [Docket No. [•]] (the "Motion"), as applicable.

Debtor Uncommon Hospitality, LLC; and (d) Union Bank, solely with respect to the OCM Assets and any other collateral securing the Union Bank Loans, in each case through their respective counsel and advisors (collectively, the "Consultation Parties") will consider written offers to acquire all of the Debtors' assets or any subset thereof (each, a "Bid"), including Bids for individual Locations, Designated Lots, or any combination of Locations.[3]

## ARTICLE 1
## OVERVIEW

**Section 1.1 Background.** As of the Petition Date, the Debtors operated approximately 320 quick-service and full-service restaurants across fifteen states: Arkansas, Connecticut, Florida, Georgia, Indiana, Massachusetts, Michigan, Mississippi, Missouri, North Carolina, Ohio, Oklahoma, Tennessee, Texas, and Virginia. Of those restaurants, 314 are operated as Wendy's® restaurants under franchise agreements with Quality Is Our Recipe, LLC ("QIOR"), a subsidiary of The Wendy's Company (together with QIOR, and as applicable, its affiliates, the "Franchisor"), one was a Bojangles, which has subsequently shut down, and five are independent-concept restaurants operated in Michigan under the Morning Belle and Blue Porch Bar & Grill brands (the "Independent Concept Locations"). The franchise agreements, development agreements, and related agreements between any Debtor and the Franchisor are referred to as the "Wendy's Franchise Agreements" or the "Franchise Agreements."

**Section 1.2 Purpose.** The Debtors are conducting a marketing and sale process designed to preserve the Debtors' core Wendy's operations and Independent Concept Locations as a going concern, to optimize the Debtors' restaurant portfolio through the sale or closure of underperforming Locations, and to pursue strategic sales of Locations in particular markets, in each case to maximize the value of the Debtors' estates for the benefit of all stakeholders. These Bidding Procedures are intended to permit the Debtors to compare, on a fair and transparent basis, Bids for the Debtors' business as a whole against Bids for individual Locations, Designated Lots, and combinations thereof.

**Section 1.3 WIL Stalking Horse Bid; Additional Stalking Horse Bidders.** The Debtors intend to enter into an asset purchase agreement no later than November 21, 2026 (the "WIL Stalking Horse APA") with Wendy's International, LLC, an affiliate of QIOR ("WIL"), for the acquisition of the 163 Wendy's restaurants identified on the schedule of purchased restaurants to the WIL Stalking Horse APA (the "Purchased Restaurants") and of the Debtors' interests in the real property underlying four of the Purchased Restaurants, located at 5166 Airport Highway, Toledo, Ohio; 828 S. Kalamazoo, Paw Paw, Michigan; 3805 Sprinkle Road, Kalamazoo, Michigan; and 1509 Lincoln Road, Allegan, Michigan (the "Purchased RE"). The Purchased Restaurants do not include the CT/MA Restaurants, the NC Restaurants, the Tennessee Restaurants, the Designated Restaurants, or the Additional Designated Restaurants (each as defined in Article 3). The Bid reflected in the WIL Stalking Horse APA (the "WIL Stalking Horse Bid") shall serve as the Stalking Horse Bid for the Purchased Restaurants and the Purchased RE on the terms set forth in Section 7.9. The Purchased RE may be severed from the WIL Stalking Horse Bid in accordance with Section 3.7. The Debtors are also authorized, but not obligated, to

[3] Quality Is Our Recipe, LLC reserves all of its rights in connection with any Bid, including any Bid that proposes the assumption and assignment of any Franchise Agreement. See Article 18.

designate one or more additional Stalking Horse Bidders for other Locations in accordance with, and subject to, Article 7.

**Section 1.4 Court Approval Required; Outside Closing Date.** Any Sale Transaction shall be subject to approval by the Court at the hearing to consider approval of the Sale Transaction(s), scheduled for December 29, 2026, at 10:00 a.m. (prevailing Eastern Time) (the "Sale Hearing"), and no Sale Transaction shall be consummated absent entry of an order of the Court approving such Sale Transaction (a "Sale Order"). Each Sale Transaction must close no later than January 5, 2027 (the "Outside Closing Date"), which date may be extended only with the written consent of each of the Debtors, the Committee, WIL, QIOR, the Administrative Agent, and Old National, each in its sole discretion; provided that the Outside Closing Date for any Sale Transaction that includes OCM Assets may be extended only with the additional consent of Union Bank.

**Section 1.5 Questions.** Any party with questions regarding these Bidding Procedures or the Sale Process should contact the Debtors' investment banker, Intrepid Investment Bankers LLC ("Intrepid" or the "Investment Banker"), Attn: Kenneth Garnett (KGarnett@intrepidib.com) and Ana Alvarenga (aalvarenga@intrepidib.com), or counsel to the Debtors, McDonald Hopkins LLC, Attn: Scott N. Opincar (sopincar@mcdonaldhopkins.com) and Michael J. Kaczka (mkaczka@mcdonaldhopkins.com).

**Section 1.6 Secured Lenders; Committee; Financing Orders.** The Debtors' prepetition secured lenders are (a) City National Bank, in its capacity as administrative agent (the "Administrative Agent") under that certain Third Amended and Restated Credit Agreement (as amended, the "CNB Credit Facility"), and the lenders thereunder; (b) Old National Bank ("Old National"), as lender under the credit facility extended to Debtor Uncommon Hospitality, LLC (the "ONB Credit Facility"); and (c) Union Bank ("Union Bank", and with the Administrative Agent and Old National, collectively, the "Prepetition Secured Lenders"), as lender under three loans (the "Union Bank Loans") extended to Debtor OCM Development, LLC ("OCM"). The Debtors' use of cash collateral is governed by the interim and final orders of the Court authorizing such use and granting adequate protection [Docket Nos. 103, 104, 105, 256, 257, 258], and any further interim or final orders entered with respect thereto (collectively, the "Cash Collateral Orders"). The official committee of unsecured creditors appointed in the Chapter 11 Cases is referred to as the "Committee."

**Section 1.7 Interpretation.** In these Bidding Procedures: (a) "including" means "including, without limitation"; (b) references to Articles, Sections, and Schedules are to those of these Bidding Procedures; (c) the singular includes the plural and vice versa; (d) references to the "Debtors" acting "in consultation with the Consultation Parties" require good-faith consultation but do not require the consent of any Consultation Party unless consent is expressly required; and (e) headings are for convenience only and do not affect interpretation. Capitalized terms are defined where first used herein; capitalized terms used but not defined herein have the meanings given to them in the Bidding Procedures Order or the Motion, as applicable.

## ARTICLE 2
## KEY DATES AND DEADLINES

**Section 2.1 Summary of Key Dates.** The following table summarizes the key dates and deadlines established by these Bidding Procedures and the Bidding Procedures Order (collectively, the "Key Dates"). Unless otherwise indicated, all times are prevailing Eastern Time. In the event of any inconsistency between this table and the text of these Bidding Procedures or the Bidding Procedures Order, the text of the Bidding Procedures Order and then these Bidding Procedures shall control.

| **Event or Deadline** | **Date and Time (prevailing Eastern Time)** |
|---|---|
| Bidding Procedures Motion filed | November 12, 2026 |
| Target entry of Bidding Procedures Order | November 24, 2026 |
| Marketing Materials distributed and Data Room opens to parties under NDA contacted as part of marketing to Contact Parties (marketing to Contact Parties may begin before entry) | Marketing ongoing; marketing materials are distributed and Data Room opens to parties under NDA no later than November 20, 2026 |
| Service of Sale Notice | No later than November 30, 2026 (within three business days after entry) |
| Publication of Sale Notice (in Nation's Restaurant News or a comparable national publication) | Within three business days after service of the Sale Notice |
| WIL Stalking Horse APA executed and Form APA (for other Locations) posted to Data Room | WIL Stalking Horse APA executed no later than November 21, 2026; Form APA posted no later than November 21, 2026 |
| Letter of Intent Deadline<br>(Not required for ultimately submitting a bid) | December 1, 2026, at 5:00 p.m. |
| Filing and service of Assumption and Assignment Notice (Cure Notice) | December 4, 2026 |
| Stalking Horse Designation Deadline (Locations other than the Purchased Restaurants and Purchased RE) | December 7, 2026 at 5:00 p.m. |
| Stalking Horse Objection Deadline | December 9, 2026 at 5:00 p.m. |
| Stalking Horse Approval Hearing (if necessary) | December 11, 2026 at 10:00 a.m. (subject to Court availability) |
| Bid Deadline | December 11, 2026, at 5:00 p.m. |
| Notification of Qualified Bidders | December 15, 2026 |
| Deadline for WIL to deliver Excluded Store Notices | December 15, 2026 |

| **Event or Deadline** | **Date and Time (prevailing Eastern Time)** |
|---|---|
| Auction (if necessary) | December 17, 2026, at 10:00 a.m., at the offices of Barnes & Thornburg LLP in Grand Rapids, Michigan or virtually |
| Filing of Notice of Successful Bidder(s) | December 18, 2026 |
| Cure/Assignability Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Auction Objection Deadline and Adequate Assurance Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Sale Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Reply Deadline | December 28, 2026, at 12:00 p.m. |
| Sale Hearing | December 29, 2026, at 10:00 a.m. |
| Target entry of Sale Order | December 29, 2026 (and in any event no later than December 31, 2026) |
| Outside Closing Date | January 5, 2027 |
| Backup Bidder release | The earlier of (a) closing with the Successful Bidder and (b) the Outside Closing Date (January 5, 2027) |

**Section 2.2** **Modification of Key Dates.** The Debtors may extend, accelerate, or otherwise modify any Key Date (other than the date of the Sale Hearing, which may be adjourned only as provided in Section 16.1 and clause (y) below) with the prior written consent (email from counsel being sufficient) of (i) the Administrative Agent, (ii) Old National, solely as to any Key Date applicable to the NC Restaurants or the Assets of Debtor Uncommon Hospitality, LLC, (iii) Union Bank, solely as to any Key Date applicable to the OCM Assets, (iv) WIL, as to any Key Date, including the Outside Closing Date, applicable to the Purchased Restaurants or the Purchased RE; and (v) the Committee, in each case such consent not to be unreasonably withheld, conditioned, or delayed; or (b) by further order of the Court. The Debtors shall promptly file on the docket of the Chapter 11 Cases, and serve on the Notice Parties, the Franchisor, and all Acceptable Bidders, a notice of any such modification. Notwithstanding the foregoing, (x) the Outside Closing Date may be extended only as provided in Section 1.4; (y) no modification shall result in the Sale Hearing being held, or the Sale Order being entered, after December 31, 2026 without the written consent of WIL; and (z) no modification shall be inconsistent with the WIL Stalking Horse APA, the Settlement Agreement among WIL, Debtors, Old National, Franchisor, the Committee, and the Administrative Agent (the "Settlement Agreement"), or the Cash Collateral Orders without the consent of the parties thereto.

**Section 2.3** **Computation of Time.** Unless otherwise specified, time periods shall be computed in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). A "business day" means any day other than a Saturday, Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a)(6).

## ARTICLE 3
## ASSETS TO BE SOLD AND PERMITTED BID STRUCTURES

**Section 3.1 Assets.** The assets available for sale (collectively, the "Assets") consist of all or any portion of the Debtors' right, title, and interest in and to (a) each restaurant operated by the Debtors, together with the related real property interests, Leases, furniture, fixtures, equipment, inventory, permits, licenses (to the extent transferable), and other assets used in the operation thereof , as listed on Schedule A hereto (each, a "Location"), and (b) the Debtors' other assets, including real property owned by the Debtors, the Debtors' executory contracts (each, a "Contract") and unexpired leases of nonresidential real property and personal property, including restaurant premises leases (each, a "Lease," and together with the Contracts, the "Contracts and Leases"), equipment, inventory, intellectual property owned by the Debtors, permits and licenses (to the extent transferable), books and records, and, to the extent assumable and assignable under section 365 of the Bankruptcy Code and subject to Article 18, the Debtors' rights under the Franchise Agreements. The Debtors' restaurant premises Leases are expected to constitute a principal component of the value of many Locations. Nothing herein constitutes a representation that any particular Contract, Lease, or Franchise Agreement is property of the estates, executory, unexpired, or assumable and assignable.

**Section 3.2 Permitted Bid Structures.** Potential Bidders may submit Bids in any of the following forms:

(a) a Bid for all, or substantially all, of the Locations and related Assets on a going-concern basis (an "Enterprise Bid" or "All-Locations Bid");

(b) a Bid for one or more, but fewer than substantially all, of the Locations, including any individual Location, any Designated Lot (defined below), or any other subset of Locations (whether or not corresponding to a Designated Lot) (a "Partial Bid" or "Lot Bid"); or

(c) any combination of the foregoing, including a Bid for multiple Designated Lots or multiple Locations that is structured as severable or conditional in accordance with Section 3.5.

A Bid may contemplate the acquisition of Locations (i) as franchised Wendy's restaurants, subject to the Franchisor's approval process, (ii) without franchise rights, for de-flagging and conversion to another concept or use (a "Conversion Bid"), as further described in Section 18.4, or (iii) in the case of the Independent Concept Locations, as operating independent restaurants.

**Section 3.3 Designated Lots.** The Debtors, in consultation with the Consultation Parties, have organized the Locations into the following initial marketing lots (each, a "Designated Lot"), which remain subject to change and may include overlapping Locations: (a) the Purchased Restaurants; (b) the Debtors' 41 restaurants located in Connecticut and Massachusetts (the "CT/MA Restaurants"); (c) the Debtors' 11 restaurants located in North Carolina and Virginia (the "NC Restaurants"); (d) the Purchased RE; (e) the OCM Assets (as defined in Section 3.8); and (f) such other groupings of Locations as the Debtors may determine; provided that the Debtors and Old National may determine to sell the NC Restaurants in a private sale outside of the Auction, upon notice to the Notice Parties and all Acceptable Bidders. The Designated Lots will be posted in the Data Room, and the Debtors may, in consultation with the Consultation Parties, revise the

Designated Lots at any time prior to the Bid Deadline upon notice to all Acceptable Bidders; provided that no revision shall alter the Purchased Restaurants or the Purchased RE without the consent of WIL. Bidders are not required to bid on a Designated Lot and may bid on any subset of Locations.

**Section 3.4 Allocation of Purchase Price.** Each Bid must allocate the purchase price (including any non-cash consideration and assumed liabilities): (a) among each Debtor entity or market whose Assets are to be acquired; and (b) separately, (i) to any Purchased RE, and (ii) to any OCM Assets. If a Bidder fails to provide an allocation, or provides an allocation the Debtors determine in good faith to be unreasonable, the Debtors, in consultation with the Consultation Parties, may determine the allocation for purposes of evaluating the Bid, which allocation shall be disclosed to the Notice Parties. Any affected Prepetition Secured Lender, the Committee, or other party in interest may object to any allocation in connection with the Sale Hearing (or such other hearing as the Court may direct), and the Court shall determine any such objection. Any allocation by a Bidder or the Debtors shall be without prejudice to the rights of any party to seek a different allocation of sale proceeds, and nothing herein shall be binding for tax purposes on any party except as agreed in a definitive agreement.

**Section 3.5 Severable and Conditional Bids.** Any Bid for more than one Location or Designated Lot must expressly state whether (a) the Bid for each Location or Designated Lot is severable and may be accepted independently (a "Severable Bid"), or (b) the Bid is conditioned on the Bidder being selected as the Successful Bidder for all, or a specified group, of the Locations or Designated Lots included in the Bid (an "All-or-Nothing Bid" or "Package Bid"). Package Bids are permitted. A Severable Bid must state the purchase price for each severable component. A Bid that does not specify whether it is severable shall be treated as an All-or-Nothing Bid.

**Section 3.6 Excluded Locations.** The following are not offered for sale under these Bidding Procedures: (a) the Debtors' 42 Wendy's restaurants located in Tennessee, Missouri, Mississippi, and Arkansas (the "Tennessee Restaurants"), which were approved to be sold via a separate private sale (the "Tennessee Sale"); (b) the restaurants designated for closure by the Debtors with the consent of WIL (the "Designated Restaurants"); and (c) any other restaurant designated for closure by the Debtors with the consent of WIL prior to the closing of the WIL Stalking Horse Bid (the "Additional Designated Restaurants"). A schedule of the Designated Restaurants shall be posted in the Data Room. Any restaurant that WIL excludes from the WIL Stalking Horse Bid by an Excluded Store Notice delivered in accordance with the WIL Stalking Horse APA may be closed by the Debtors or offered for sale to a third party, and the Debtors shall notify Acceptable Bidders of any such restaurant made available for Bids.

**Section 3.7 Purchased RE; Qualified RE Bids.** The Debtors may solicit higher or otherwise better Bids for the Purchased RE, and the Purchased RE may be severed from the WIL Stalking Horse Bid to the extent the Debtors determine to pursue a Qualified RE Bid. A Bid for any of the Purchased RE (other than the WIL Stalking Horse Bid) shall be a "Qualified RE Bid" only if (a) it provides for closing on or before the Outside Closing Date, and (b) if the Bidder (an "RE Purchaser") desires to lease the applicable property to WIL, it provides for a lease to WIL, entered into on or before (or simultaneously with) the closing of the WIL Stalking Horse Bid for no additional consideration, that (i) has an initial term of ten years at a fixed annual base rent equal to six percent (6%) of the sales at that location, (ii) grants WIL six successive options to renew for five years each, and (iii) provides that, beginning in the eleventh lease year, base rent shall increase

by no more than eight percent (8%) at the start of each renewal term (the "SLB Terms"). Any lease to WIL of the property at 816 East 16th Street, Holland, Michigan (site 7790) shall be on the SLB Terms.

**Section 3.8 OCM Assets**. The Assets include all of the right, title, and interest of OCM in and to its assets (collectively, the "OCM Assets"). The OCM Assets are not included in the Purchased Restaurants, the Purchased RE, or the WIL Stalking Horse Bid. The OCM Assets may be bid on separately or as part of any other Bid, and any Bid that includes OCM Assets must separately allocate value to them in accordance with Section 3.4(b)(ii). Any Sale Transaction of OCM Assets shall be subject to the rights of Union Bank under section 363(k) of the Bankruptcy Code and Sections 12.1 and 12.5.

## ARTICLE 4
## MARKETING PROCESS AND PARTICIPATION REQUIREMENTS

**Section 4.1 Contact Parties.** In consultation with the Investment Banker and the Debtors' other professionals, the Debtors have developed a list of parties whom they believe may be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, a Sale Transaction, including existing Wendy's franchisees, other restaurant operators, strategic investors, financial sponsors, and real estate investors (collectively, the "Contact Parties"). The Debtors may supplement the list of Contact Parties throughout the Sale Process. The Debtors may commence marketing to Contact Parties prior to entry of the Bidding Procedures Order. Contact Parties also include parties who have expressed inbound interest in consummating a Sale Transaction.

**Section 4.2 Information Package.** The Debtors may distribute (to the extent not already distributed) to each Contact Party and any other interested party an information package (the "Information Package") consisting of (a) a teaser or summary of the investment opportunity; (b) a copy of these Bidding Procedures, the Bidding Procedures Order, and the Sale Notice; (c) a form confidentiality agreement (a "Confidentiality Agreement"); and (d) such other materials as the Debtors deem appropriate.

**Section 4.3 Participation Requirements.** To receive due diligence information, including access to the Data Room, a party interested in consummating a Sale Transaction (a "Potential Bidder") must deliver (or have delivered) to the Debtors, the Investment Banker, and Debtors' counsel (collectively, the "Debtors' Advisors") the following (collectively, the "Bid Documents"):

(a) an executed Confidentiality Agreement in form and substance acceptable to the Debtors, to the extent not already executed; and

(b) disclosure of the identity of the Potential Bidder and each of its principals.

**Section 4.4 Acceptable Bidders.** A Potential Bidder that has submitted acceptable Bid Documents is an "Acceptable Bidder." Potential Bidders, Acceptable Bidders, and Qualified Bidders (including any Stalking Horse Bidder) are each referred to as a "Bidder." Except as otherwise determined in the Debtors' business judgment (in consultation with the Consultation Parties), only Acceptable Bidders may submit LOIs and Bids.

**Section 4.5** **<u>No Collusion; Communications Restrictions.</u>** Each Potential Bidder and Acceptable Bidder shall not, without the prior written consent of the Debtors (after consultation with the Consultation Parties), (a) communicate with any other Potential Bidder regarding the Sale Process, any Bid, or the Assets; (b) enter into any agreement, arrangement, or understanding with any other Potential Bidder or person to control or affect the price or terms of any Bid or to refrain from bidding; or (c) communicate with any landlord, contract counterparty, employee, supplier, or lender of the Debtors regarding the Sale Process, except as expressly permitted herein or by the Debtors. Communications with the Franchisor regarding franchisee approval are governed by Section 18.2. The Debtors may permit Acceptable Bidders to coordinate on complementary Partial Bids provided such coordination is disclosed in writing to the Debtors and the Consultation Parties.

## ARTICLE 5
## DUE DILIGENCE

**Section 5.1** **<u>Data Room.</u>** The Debtors will provide each Acceptable Bidder with reasonable access to an electronic data room (the "<u>Data Room</u>") containing information regarding the Debtors and the Assets, including Location-level financial and operating information, Lease abstracts, the Form APA (when available), any schedule of Designated Lots, and the Franchisor Approval Materials described in Section 18.3. The Debtors will also provide reasonable access to management and the Investment Banker, and reasonable on-site access to Locations upon advance written request and subject to such restrictions as the Debtors deem appropriate to avoid disruption of operations. All due diligence requests shall be directed to the Investment Banker.

**Section 5.2** **<u>Competitively Sensitive Information.</u>** For any Acceptable Bidder that is a competitor of the Debtors, an existing Wendy's franchisee, or affiliated with any of the foregoing, the Debtors reserve the right to withhold, or to delay providing, any information that the Debtors determine in their business judgment is competitively sensitive or otherwise inappropriate for disclosure to such Acceptable Bidder, or to provide such information on a "clean team" or "professional eyes only" basis, in each case after notice to the Consultation Parties.

**Section 5.3** **<u>Reciprocal Diligence.</u>** Each Acceptable Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors, the Debtors' Advisors, and the Consultation Parties regarding the Acceptable Bidder and its proposed Sale Transaction, including its ability to obtain Franchisor approval, to provide adequate assurance of future performance, and to close by the Outside Closing Date. Failure to comply may be a basis for the Debtors to determine that a Bid is not a Qualified Bid.

**Section 5.4** **<u>Termination of Diligence.</u>** The Debtors shall have no obligation to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid. The Debtors may terminate access to the Data Room for any Acceptable Bidder that (a) does not timely submit a LOI, Bid, or Franchisor Approval Materials, (b) breaches its Confidentiality Agreement or these Bidding Procedures, or (c) the Debtors determine, in consultation with the Consultation Parties, does not intend in good faith to, or lacks the capacity to, consummate a Sale Transaction. Upon termination of access, the affected party shall return or destroy all non-public information provided to it in accordance with its Confidentiality Agreement.

**Section 5.5** **<u>No Representations.</u>** Neither the Debtors nor any of their representatives make any representation or warranty as to the information provided through the Data Room or

otherwise, except to the extent set forth in a definitive agreement executed by the applicable Debtors and approved by the Court.

## ARTICLE 6
## LETTERS OF INTENT

**Section 6.1 LOI Deadline.** Each Acceptable Bidder that wishes to continue in the Sale Process is requested to submit a non-binding written letter of intent (a "LOI") to the Debtors' Advisors so as to be actually received no later than **December 1, 2026, at 5:00 p.m.** (prevailing Eastern Time) (the "LOI Deadline"). The Debtors shall promptly provide copies of all LOIs to the Consultation Parties.

**Section 6.2 Contents of LOI.** Each LOI should include:

(a) the Locations, Designated Lots, Purchased RE and other Assets the Acceptable Bidder proposes to acquire, and whether the proposal is an Enterprise Bid, a Partial Bid, or a combination thereof;

(b) an indicative purchase price, with a preliminary allocation by Location, the form of consideration, and the liabilities proposed to be assumed;

(c) the anticipated sources of financing and the status of any financing commitments;

(d) Acceptable Bidder's intentions with respect to the Franchise Agreements, including whether it is (or intends to seek approval as) a Wendy's franchisee (and if so, the Bidder must provide completed required documentation to seek approval as a Wendy's franchisee, which form documentation will be provided in the Data Room), or whether it intends to submit a Conversion Bid and its proposed concept or use;

(e) the Acceptable Bidder's intentions with respect to the Purchased RE, Leases, employees, and Independent Concept Locations;

(f) any remaining due diligence, key contingencies, and required approvals; and

(g) whether the Acceptable Bidder wishes to be considered for designation as a Stalking Horse Bidder.

**Section 6.3 Effect of LOI.** LOIs are non-binding and are intended to assist the Debtors in evaluating the Sale Process, refining Designated Lots, and identifying potential Stalking Horse Bidders. Submission of a LOI is not a prerequisite to submission of a Bid, but the Debtors may, in consultation with the Consultation Parties, prioritize diligence access for Acceptable Bidders that timely submit LOIs.

## ARTICLE 7
## STALKING HORSE DESIGNATION AND BID PROTECTIONS

**Section 7.1 Authority to Designate.** In addition to the designation of WIL pursuant to Section 7.9, the Debtors are authorized, in the exercise of their business judgment and in consultation with the Consultation Parties, to select one or more Acceptable Bidders to act as a stalking horse bidder (each, together with WIL, a "Stalking Horse Bidder") for all of the Locations

(excluding the Purchased Restaurants and Purchased RE) or for any Location, Designated Lot, or other subset of Locations, and to enter into an asset purchase agreement with such Stalking Horse Bidder (each, together with the WIL Stalking Horse APA, a "Stalking Horse APA," and the Bid reflected therein, a "Stalking Horse Bid"), no later than **December 7, 2026** (the "Stalking Horse Designation Deadline"). The Debtors are under no obligation to designate any additional Stalking Horse Bidder.

**Section 7.2 Bid Protections.** In connection with the designation of a Stalking Horse Bidder, the Debtors may agree (after consultation with the Consultation Parties) to provide the following bid protections for any party other than WIL: a break-up fee and reimbursement of the Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses incurred in connection with the Stalking Horse APA in an amount not to exceed 3.0% of the cash purchase price under such Stalking Horse APA (collectively, the "Bid Protections").

**Section 7.3 Payment of Bid Protections.** Any approved Bid Protections (a) shall be payable only if, and to the extent provided in the Stalking Horse APA and the Bidding Procedures Order, the Debtors consummate a Sale Transaction (an "Alternative Transaction") for all or any portion of the same Assets with a party other than the Stalking Horse Bidder, (b) shall be payable solely from the proceeds of such Alternative Transaction at the closing thereof, and (c) shall constitute allowed administrative expense claims against the applicable Debtors' estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code. Bid Protections shall not be payable from cash collateral or other proceeds of the Prepetition Secured Lenders' collateral other than the proceeds of such Alternative Transaction.

**Section 7.4 Limitations.** (a) No Potential Bidder, Acceptable Bidder, or Qualified Bidder other than a Stalking Horse Bidder approved in accordance with this Article 7 shall be entitled to any break-up fee, expense reimbursement, termination fee, or similar payment. (b) No Prepetition Secured Lender or affiliate thereof that submits a credit bid shall be eligible for Bid Protections unless the Debtors, the Committee, and the other Prepetition Secured Lenders consent. (c) No insider of the Debtors shall be eligible for Bid Protections absent further order of the Court. (d) WIL shall not be entitled to any Bid Protections, break-up fee, or expense reimbursement.

**Section 7.5 Stalking Horse Notice.** Within one business day after executing a Stalking Horse APA, the Debtors shall file with the Court and serve on the Notice Parties, the Franchisor, all landlords and counterparties to Contracts and Leases relating to the affected Locations, and all parties that have executed a Confidentiality Agreement, a notice (a "Stalking Horse Notice") that: (a) identifies the Stalking Horse Bidder and states whether it is an insider of, or has any connection to, the Debtors; (b) identifies the Locations and other Assets subject to the Stalking Horse Bid; (c) sets forth the purchase price and the form of consideration; (d) sets forth the proposed Bid Protections, if any; (e) attaches the Stalking Horse APA; (f) identifies any provision that deviates from these Bidding Procedures; (g) states the Stalking Horse Objection Deadline; and (h) states that the Adequate Assurance Information is available to affected Counterparties upon request on a confidential basis.

**Section 7.6 Objections and Approval.** Objections to the designation of a Stalking Horse Bidder (other than WIL, whose designation is approved by the Bidding Procedures Order) or the Bid Protections must be filed and served on the Notice Parties no later than December 9, 2026 at 5:00 p.m. (prevailing Eastern Time) (the "Stalking Horse Objection Deadline"). If no timely

objection is filed, the Debtors may submit a proposed order approving the Stalking Horse Bid and Bid Protections under certification of counsel, and the Court may enter such order without further hearing. If a timely objection is filed and not resolved, the Court shall hear the objection at an expedited hearing on not less than two business days' notice (the "Stalking Horse Approval Hearing"), which for a Stalking Horse Notice served by the Stalking Horse Designation Deadline is expected to be December 11, 2026, subject to Court availability.

**Section 7.7 Effect of Designation.** Upon approval, (a) each Stalking Horse Bidder shall be deemed a Qualified Bidder and its Stalking Horse Bid a Qualified Bid for all purposes, including the Auction; (b) the Stalking Horse APA shall serve as the Form APA for the Locations covered thereby; and (c) any Overbid for Locations subject to a Stalking Horse Bid must provide consideration of not less than the sum of (i) the purchase price under the Stalking Horse Bid and (ii) the aggregate amount of the Bid Protections (the "Minimum Overbid"). The deposit of any Stalking Horse Bidder shall be governed by its Stalking Horse APA.

**Section 7.8 Interaction with Enterprise and Combination Bids.** An Enterprise Bid, Package Bid, or Combination Bid (as defined in Section 10.5) that includes any Location subject to a Stalking Horse Bid (including any Purchased Restaurant or Purchased RE) must, as to such Locations, exceed the Minimum Overbid. The Debtors shall require any such Bidder to allocate value to the Locations subject to the Stalking Horse Bid, and any such Bid must provide sufficient cash consideration to fund any Bid Protections at closing. If an Enterprise Bid or Combination Bid that includes such Locations is selected as the Successful Bid and consummated, the Stalking Horse Bidder (other than WIL) shall be entitled to its Bid Protections from the proceeds thereof in accordance with Section 7.3.

**Section 7.9 WIL Stalking Horse Bid.** The following provisions apply to the WIL Stalking Horse Bid, and in the event of any conflict with the WIL Stalking Horse APA, the WIL Stalking Horse APA shall control:

(a) Designation. Upon entry of the Bidding Procedures Order and execution of the WIL Stalking Horse APA, WIL is designated as the Stalking Horse Bidder for the Purchased Restaurants and the Purchased RE, and WIL is deemed a Qualified Bidder and the WIL Stalking Horse Bid a Qualified Bid for all purposes, without the need for a Stalking Horse Notice.

(b) No Bid Protections. WIL shall not be entitled to any Bid Protections for the Purchased Restaurants and the Purchased RE, and the Minimum Overbid for the Purchased Restaurants and the Purchased RE shall equal the value of the WIL Stalking Horse Bid plus the applicable Minimum Overbid Increment.

(c) Backup Bidder. If the Debtors select a Sale Transaction for the Purchased Restaurants or the Purchased RE with a purchaser other than WIL, WIL shall serve as the Backup Bidder for such Assets through the Outside Closing Date.

(d) Deposit. Contemporaneously with the execution of the WIL Stalking Horse APA, QIOR shall pay a deposit of $2,000,000 to Chicago Title, as title company and escrow agent for the WIL Stalking Horse Bid (the "WIL Deposit"), which shall be refundable unless WIL fails to close due to its uncured material breach of the WIL Stalking Horse APA. The WIL Deposit shall be deemed to satisfy the Good Faith Deposit requirement for the WIL Stalking Horse Bid, and

WIL shall not be required to supplement the WIL Deposit under Section 14.1. The WIL Deposit shall be held, applied, returned, or forfeited solely in accordance with the terms of the WIL Stalking Horse APA, and Sections 15.2 and 15.3 of these Bidding Procedures shall not apply to it.

## ARTICLE 8
## BID DEADLINE

**Section 8.1 Bid Deadline.** An Acceptable Bidder that desires to make a Bid shall deliver written copies of its Bid, in both PDF and Microsoft Word format, to the Debtors' Advisors so as to be actually received no later than **December 11, 2026, at 5:00 p.m.** (prevailing Eastern Time) (the "Bid Deadline"). The Debtors shall promptly (and in any event within one business day) provide copies of all Bids received to the Consultation Parties (other than a Consultation Party that is then a bidder for the same Assets), and shall provide copies of Bids proposing to take assignment of Franchise Agreements, on a professional-eyes-only basis, to counsel to the Franchisor, to the extent of the information described in Section 18.3.

**Section 8.2 Extension.** The Debtors may extend the Bid Deadline for all or certain Locations, or for one or more Acceptable Bidders, only in accordance with Section 2.2. Any Bid received after the Bid Deadline shall not constitute a Qualified Bid unless the Debtors, in consultation with the Consultation Parties, determine otherwise.

## ARTICLE 9
## BID REQUIREMENTS

**Section 9.1 Required Contents.** To be eligible for consideration as a Qualified Bid, a Bid must be in writing and satisfy each of the following requirements (collectively, the "Bid Requirements"), unless waived by the Debtors in accordance with Section 10.4:

(a) Identification of Assets. The Bid must identify with particularity each Location (by store number and address as set forth on Schedule A), each Designated Lot (if applicable), and all other Assets to be acquired, any Assets to be excluded, and the liabilities to be assumed.

(b) Purchase Price. The Bid must state the purchase price in U.S. dollars (the "Purchase Price"), identify separately the cash and any non-cash components (including any credit bid and the assumption of liabilities), and include the allocation required by Section 3.4. A Bid must state whether it is a Severable Bid or an All-or-Nothing Bid as required by Section 3.5. Any Bid for Locations subject to a Stalking Horse Bid must equal or exceed the Minimum Overbid for such Locations.

(c) Good Faith Deposit. The Bid must be accompanied by a cash deposit in an amount equal to ten percent (10%) of the Purchase Price (or, in the case of a Bid that includes a credit bid, ten percent (10%) of the cash component of the Purchase Price) (the "Good Faith Deposit"), delivered by wire transfer to Chicago Title (the "Escrow Agent") to be held in a segregated, non-interest-bearing escrow account in accordance with Article 15.

(d) Marked Agreement. The Bid must include an executed asset purchase agreement, together with all schedules and exhibits, and a redline marked against the form asset

purchase agreement posted in the Data Room (the "Form APA") or, as to Locations subject to a Stalking Horse Bid, the applicable Stalking Horse APA. The Bid must identify with particularity each condition to closing. As to Locations subject to a Stalking Horse Bid, the terms of the Bidder's proposed agreement must be, in the aggregate, not materially more burdensome to the Debtors than those of the applicable Stalking Horse APA.

(e) Contracts and Leases; Cure Costs. The Bid must identify each Contract and Lease (including each restaurant premises Lease) that the Bidder proposes to have assumed and assigned to it (the "Proposed Assumed Contracts") and must state whether the Bidder will pay all cure costs required under section 365(b) of the Bankruptcy Code ("Cure Costs") with respect thereto or, if not, the amount of Cure Costs the Bidder proposes to pay. Bids that assume a greater number of Leases and Contracts, and the associated Cure Costs, may be viewed more favorably as reducing rejection damages claims against the estates.

(f) Adequate Assurance Information. The Bid must include information sufficient to demonstrate adequate assurance of future performance under section 365(f)(2)(B) and, as to Leases of real property in shopping centers, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (i) the identity of the proposed assignee and its corporate structure, including the name of any guarantor; (ii) the proposed assignee's audited (or, if unavailable, unaudited) financial statements for the last two fiscal years and current interim financial statements, tax returns, and bank statements, as applicable; (iii) a description of the proposed assignee's restaurant operating experience, including number and location of restaurants operated and concepts; (iv) the proposed use of each leased premises, including any change of concept, trade name, or use; (v) any financial projections and the proposed capitalization of the assignee; and (vi) a contact person for counterparties to request additional information. Each Bidder must consent to the Debtors' disclosure of its Adequate Assurance Information, on a confidential basis, to the affected counterparties and their counsel.

(g) Committed Financing. The Bid must include written evidence of committed financing or other financial ability to consummate the Sale Transaction and pay the Purchase Price in cash at closing, satisfactory to the Debtors in consultation with the Consultation Parties, including current financial statements (audited, if available), contact information for verification of financing sources, and confirmation that any debt or equity funding commitment is not subject to any contingency.

(h) No Contingencies. The Bid may not be conditioned on obtaining financing, the outcome of any due diligence, or internal approvals, but may be conditioned on Court approval, receipt of required regulatory approvals and, as disclosed in accordance with clause (m), Franchisor approval.

(i) Corporate Authority. The Bid must include evidence that the Bidder has obtained all requisite corporate, board, or other approvals for the submission, execution, delivery, and closing of the Bid and Sale Transaction.

(j) Identity and Insider Disclosure. The Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in the Bid (including each equity holder, the ultimate beneficial owners of the Bidder, and each financing source), the complete terms of any such participation, and whether the Bidder or any participant is an insider of any Debtor or has any agreement or understanding with any insider, management member, Prepetition Secured Lender, or the Franchisor concerning the Sale Transaction or post-closing employment or compensation.

(k) Irrevocability. The Bid must state that it is irrevocable until the earlier of (i) the closing of the Sale Transaction with the Successful Bidder for the relevant Assets and (ii) January 5, 2027 (the "Backup Bid Expiration Date"), if selected as a Backup Bid, and otherwise until the conclusion of the Sale Hearing.

(l) As Is, Where Is; No Bid Protections. The Bid must include an acknowledgment that the Bidder (i) has had an opportunity to conduct due diligence, (ii) has relied solely on its own independent review and not on any representation except as set forth in its definitive agreement, and (iii) is acquiring the Assets on an "as is, where is" basis as described in Article 20; and a statement that the Bidder is not entitled to any break-up fee, expense reimbursement, or similar payment (other than an approved Stalking Horse Bidder) and waives any right to assert a substantial contribution claim under section 503(b) of the Bankruptcy Code in connection with the Sale Process.

(m) Franchisor Approval Status. If the Bid contemplates the assumption and assignment of any Wendy's Franchise Agreement, the entry into new franchise agreements, or the continued operation of any Location under the Wendy's brand, the Bid must disclose (i) whether the Bidder is an existing franchisee of the Franchisor in good standing, (ii) the status of any application for, or communications regarding, franchisor approval, (iii) whether the Bidder has received or expects to receive franchisor approval, and any conditions to such approval, and (iv) any proposed development, remodel, or reimaging commitments. Bidders seeking to operate Wendy's Locations will be reviewed by QIOR under the expedited approval process described in Section 18.1. If the Bid is a Conversion Bid, it must disclose the matters required by Section 18.4. Each Bid for Wendy's Locations must provide for payment of the Franchisor Cure Costs at closing in accordance with Section 18.5.

(n) Employees. The Bid must state whether, and on what terms, the Bidder intends to offer employment to the Debtors' restaurant-level and corporate employees at the acquired Locations and must identify any obligations the Bidder will assume.

(o) Regulatory Approvals. The Bid must identify any governmental, regulatory, or third-party approvals required to consummate the Sale Transaction (including any transfers of liquor licenses for the Blue Porch Bar & Grill Locations or other Locations, and health, food service, and other operating permits), the Bidder's plan and timeline for obtaining such approvals, and any proposed interim management or similar arrangements pending such transfers.

(p) Timing. The Bid must include a binding commitment to consummate the Sale Transaction on or before the Outside Closing Date, which may be extended only as provided in Section 1.4, together with a description of any anticipated impediments.

(q) Compliance and Jurisdiction. The Bid must include a statement that the Bidder agrees to be bound by these Bidding Procedures and the Bidding Procedures Order, has not engaged in any collusion with respect to the Bid or the Sale Process, and consents to the jurisdiction of the Court as set forth in Article 22.

(r) Contact Information. The Bid must include the names and contact information of the Bidder's authorized representatives and legal and financial advisors.

## ARTICLE 10
## QUALIFIED BIDS

**Section 10.1 Designation.** A Bid that satisfies the Bid Requirements, as determined by the Debtors in consultation with the Consultation Parties, is a "Qualified Bid," and the Acceptable Bidder submitting it is a "Qualified Bidder." Any Stalking Horse Bidder and any Prepetition Secured Lender submitting a credit bid in compliance with Article 12 shall be deemed a Qualified Bidder.

**Section 10.2 Notice.** No later than **December 15, 2026**, the Debtors shall notify each Acceptable Bidder that submitted a Bid whether its Bid is a Qualified Bid, and shall provide the Consultation Parties and counsel to the Franchisor with a list of Qualified Bidders and the Locations included in each Qualified Bid.

**Section 10.3 Cure of Deficiencies.** If a Bid fails to satisfy one or more Bid Requirements, the Debtors may, in consultation with the Consultation Parties, notify the Acceptable Bidder of the deficiencies and provide it an opportunity to cure such deficiencies prior to the Auction.

**Section 10.4 Waiver.** The Debtors, in consultation with the Consultation Parties, may waive non-material Bid Requirements; provided that the Debtors may not waive (a) the Good Faith Deposit requirement absent consent of the Prepetition Secured Lenders, (b) any requirement of Article 18 or any right of the Franchisor under the Franchise Agreements or applicable law, or (c) any Key Date, including the Outside Closing Date without first obtaining the written consent of each party required under Section 2.2 of these Bidding Procedures.

**Section 10.5 Aggregation.** The Debtors, in consultation with the Consultation Parties, may aggregate two or more non-overlapping Partial Bids (whether submitted by one or more Acceptable Bidders, including unaffiliated Acceptable Bidders) into a single combined Bid (a "**Combination Bid**"), and may treat such Combination Bid as a single Qualified Bid for purposes of the Auction; provided that each component Bid independently satisfies the Bid Requirements.

**Section 10.6 Modification of Qualified Bids.** Between the Bid Deadline and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid. A Qualified Bidder may not modify, amend, or withdraw its Qualified Bid except for proposed amendments that increase the Purchase Price or otherwise improve its terms, as determined by the Debtors in consultation with the Consultation Parties.

## ARTICLE 11
## EVALUATION AND COMPARISON OF BIDS

**Section 11.1 Generally.** The Debtors, in consultation with the Consultation Parties, shall evaluate Qualified Bids to determine which Qualified Bid or combination of Qualified Bids represents the highest or otherwise best offer for the Assets. The Debtors, in consultation with the Consultation Parties, may determine that a lower-priced Bid is the highest or otherwise best Bid.

**Section 11.2 Bid Assessment Criteria.** In evaluating Bids, the Debtors may consider, without limitation (collectively, the "Bid Assessment Criteria"):

(a) the amount and form of total consideration, including cash and non-cash components;

(b) the liabilities assumed, including Cure Costs and other obligations under Proposed Assumed Contracts;

(c) the number of Leases and Contracts to be assumed and the corresponding reduction in rejection damages and other claims against the estates;

(d) the number of employees to be offered employment and potential WARN exposure;

(e) the likelihood and timing of obtaining Franchisor approval, and the effect of any termination of the Franchise Agreement or any dispute with the Franchisor on the Bid;

(f) the certainty of closing, including financing, regulatory approvals, and other conditions, and the ability to close by the Outside Closing Date;

(g) the value of Locations not included in the Bid, and the estimated wind-down, closing, de-identification, and carrying costs for such Locations (the "Residual Value/Cost Adjustment");

(h) tax consequences to the estates;

(i) any Bid Protections payable;

(j) the impact on the Debtors' estates, creditors, and other stakeholders; and

(k) any other factors the Debtors, in consultation with the Consultation Parties, deem relevant consistent with their fiduciary duties.

**Section 11.3 Comparison of Enterprise and Partial Bids.** To compare Bids across different groupings of Locations, the Debtors, in consultation with the Consultation Parties, may aggregate non-overlapping Partial Bids into one or more Combination Bids and compare the value of each Combination Bid (after the Residual Value/Cost Adjustment for any Locations not covered) against each Enterprise Bid and each other Combination Bid using the Bid Assessment Criteria. Because Designated Lots may include overlapping Locations, the Debtors' determination shall consider both a "sum of the parts" value analysis (aggregating the highest or otherwise best Bids for separate Designated Lots or Locations) and a "consolidated" value analysis (Bids for combined groupings, including Enterprise Bids). The determination of the highest or otherwise best Bid shall be made by the Debtors (a) in consultation with the Administrative Agent and the

Committee, as to all Locations other than the NC Restaurants, and (b) in consultation with Old National and the Committee as to the NC Restaurants. The Debtors may determine, in consultation with the Consultation Parties, that a combination of Partial Bids, an Enterprise Bid, or a combination of an Enterprise Bid for certain Locations and Partial Bids for other Locations represents the highest or otherwise best value.

**Section 11.4 Baseline Bids.** The Debtors shall determine, (a) in consultation with the Administrative Agent and the Committee as to all Locations other than the NC Restaurants, and (b) in consultation with Old National and the Committee, as to the NC Restaurants, the starting bid for each Designated Lot and the Qualified Bid or Qualified Bids (including any Combination Bid) that represent the highest or otherwise best Bid for each Location, Designated Lot, or grouping to be auctioned (each, a "Baseline Bid"), and shall notify all Qualified Bidders and the Consultation Parties of the Baseline Bid(s) and provide copies thereof (or a summary of the material terms). Unless a higher or otherwise better Qualified Bid is received, the WIL Stalking Horse Bid shall be the Baseline Bid for the Purchased Restaurants and the Purchased RE.

## ARTICLE 12
## CREDIT BIDDING

**Section 12.1 Right to Credit Bid.** Subject to section 363(k) of the Bankruptcy Code and the Cash Collateral Orders, each Prepetition Secured Lender (including the Administrative Agent on behalf of the lenders under the CNB Credit Facility, acting at the direction of the requisite lenders thereunder) may credit bid all or any portion of its allowed secured claims, but only with respect to Assets constituting its collateral. Specifically, (a) the Administrative Agent may credit bid only against collateral securing the CNB Credit Facility; (b) Old National may credit bid only against collateral of Debtor Uncommon Hospitality, LLC securing the ONB Credit Facility; and (c) Union Bank may credit bid only against collateral of OCM securing the Union Bank Loans. Any secured creditor other than the Administrative Agent that intends to credit bid shall, as a condition thereto, (i) notify the Debtors in writing no later than December 4, 2026, at 5:00 p.m. (prevailing Eastern Time), and (ii) provide such documentation as the Debtors reasonably request to establish the liens, claims, and encumbered Assets that are the subject of the proposed credit bid.

**Section 12.2 Challenge Rights.** Any credit bid shall be subject to the rights of the Committee and other parties in interest to challenge the validity, extent, priority, or enforceability of the applicable liens and claims in accordance with, and within the period set forth in, the Cash Collateral Orders. If a successful challenge is asserted, the Court may grant such relief as is appropriate, including requiring the credit bidder to pay cash in lieu of the challenged portion of the credit bid.

**Section 12.3 Cash Component.** A credit bid must include cash consideration sufficient to pay (a) any liens senior to the credit bidder's liens on the Assets subject to the bid, (b) any Bid Protections payable on account of such Assets, (c) Cure Costs and other assumed obligations required to be paid at closing, to the extent not assumed by the credit bidder, (d) the purchase price for any Assets that are not the credit bidder's collateral, (e) all transaction fees and costs (including the fees and costs of Intrepid), and (f) amounts in accordance with any approved budgets and the applicable Cash Collateral Orders.

**Section 12.4** **Qualified Bidder Status; Deposit.** A Prepetition Secured Lender submitting a credit bid in compliance with this Article 12 shall be deemed a Qualified Bidder and shall not be required to post a Good Faith Deposit with respect to the credit bid portion of its Bid, but shall be required to post a Good Faith Deposit with respect to any cash component.

**Section 12.5** **Loss of Consultation Rights.** A Prepetition Secured Lender that informs the Debtors that it intends to credit bid, or that submits a Bid, shall cease to be a Consultation Party with respect to the Locations and Assets that are the subject of its credit bid, and the Debtors shall not share other Bids for such Assets with it, until such Lender irrevocably withdraws its Bid or confirms in writing that it will not bid, at which time its consultation rights shall be restored.

## ARTICLE 13
## AUCTION

**Section 13.1** **Conduct of Auction; Cancellation.** If the Debtors receive two or more Qualified Bids (including any Stalking Horse Bid) for the same or overlapping Locations, the Debtors shall conduct the Auction with respect to such Locations. If, as to any Location or group of Locations, the Debtors receive only one Qualified Bid (including where a Stalking Horse Bid is the only Qualified Bid), the Debtors may, in consultation with the Consultation Parties, cancel the Auction as to such Locations, designate such Qualified Bid as the Successful Bid, and file a notice thereof with the Court. If no Qualified Bid is received for a Location, the Debtors may, in consultation with the Consultation Parties, close or otherwise dispose of such Location in accordance with applicable orders of the Court; provided that, through the Outside Closing Date, the Debtors shall not close any Purchased Restaurant, CT/MA Restaurant, or Tennessee Restaurant other than (a) Designated Restaurants (which may be closed on or after October 30, 2026), Additional Designated Restaurants, and Locations subject to an Excluded Store Notice, and (b) Purchased Restaurants, if the WIL Stalking Horse APA is not executed on or before November 21, 2026 or the Court does not approve the WIL Stalking Horse Bid on or before December 31, 2026; and provided further that any decision to close a NC Restaurant shall be made by the Debtors and Old National.

**Section 13.2** **Time and Place; Auction Notice.** The Auction shall commence on **December 17, 2026, at 10:00 a.m.** (prevailing Eastern Time) at the offices of Barnes & Thornburg LLP, 171 Monroe Ave NW #1000, Grand Rapids, MI 49503, or virtually by video conference, or at such other time and place as the Debtors may determine and announce to all Qualified Bidders and the Consultation Parties. No later than December 15, 2026, the Debtors shall file a notice on the docket (the "Auction Notice") stating (a) the location and format of the Auction, (b) the Locations and Designated Lots to be auctioned, and (c) whether the Debtors, in consultation with the Consultation Parties, intend to conduct the Auction in multiple sessions, or shall file a notice of cancellation of the Auction in accordance with Section 13.1.

**Section 13.3** **Attendance.** Only the Debtors, the Qualified Bidders (each of which may appear through a duly authorized representative), the Consultation Parties, counsel to the Franchisor, the Office of the United States Trustee, and their respective professionals may attend the Auction. Only Qualified Bidders may make Bids at the Auction. Each Qualified Bidder shall disclose the identity of all parties participating in its Bid.

**Section 13.4** **Open Bidding; Record.** Bidding at the Auction shall be conducted openly, and each Qualified Bidder shall be informed of the terms of the previous Bids. The Auction shall be transcribed or video recorded. Each Qualified Bidder shall confirm on the record that (a) it has not engaged in any collusion with respect to the bidding or the Sale Process, (b) its Bid is a good-faith, bona fide offer that it intends to consummate if selected, and (c) it is not, and has not been, party to any undisclosed agreement concerning the Auction.

**Section 13.5** **Minimum Overbid Increment.** Bidding shall commence at the applicable Baseline Bid. Each subsequent Bid (each, an "Overbid") must exceed the then-prevailing highest or otherwise best Bid by the minimum overbid increments set by the Debtors in consultation with the Consultation Parties prior to the Auction and may differ for an Enterprise Bid and a Partial Bid (each, a "Minimum Overbid Increment"). For any Locations subject to a Stalking Horse Bid, the first Overbid must equal or exceed the Minimum Overbid. The Debtors may, in consultation with the Consultation Parties, adjust the Minimum Overbid Increment during the Auction upon announcement to all participants. Overbids may include non-cash consideration, and the Debtors shall determine the value thereof in consultation with the Consultation Parties. Each Overbid shall remain open and binding until the Debtors accept a higher or otherwise better Overbid. To the extent not previously provided, a Qualified Bidder submitting an Overbid must provide evidence reasonably acceptable to the Debtors, in consultation with the Consultation Parties, of its ability to close at the amount of such Overbid.

**Section 13.6** **Structure of Bidding Rounds.** The Debtors may conduct the Auction in such sequence as they determine, including: (a) separate auction sessions for individual Locations, Designated Lots, or groups thereof (each, a "Lot Round"), at the conclusion of which the Debtors shall identify the prevailing highest or otherwise best Bid for each; and (b) a subsequent combined round (the "Combined Round") in which the aggregated prevailing Lot Round Bids (and any Combination Bids) are compared against the prevailing Enterprise Bid(s), with Enterprise Bidders and Lot Round Bidders permitted to submit further Overbids. In the Combined Round, a Bidder may add Locations to its Bid if it satisfies the applicable Minimum Overbid Increment as to such Locations. The Debtors may set deadlines for the submission of Overbids in each round and may permit breaks for consideration of Bids.

**Section 13.7** **Prevailing Highest Bid.** After each round, the Debtors shall announce the Bid or combination of Bids that the Debtors, in consultation with the Consultation Parties, have determined to be the highest or otherwise best for each Location or grouping then being auctioned (the "Prevailing Highest Bid") and the basis for such determination, including the material terms thereof.

**Section 13.8** **Additional Procedures; Adjournment; Unsold Assets.** The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time to make Overbids and requirements to bid in each round), provided such rules are not inconsistent with the Bidding Procedures Order or the Bankruptcy Code. The Debtors may adjourn the Auction one or more times, modify the Auction, or cancel the Auction, upon notice to the Qualified Bidders and the Consultation Parties and filing of a notice with the Court. If, after the close of the Auction, any Locations or other Assets are not included in a Successful Bid (the "Unsold Assets"), the Debtors may, in consultation with the Consultation Parties, conduct a further marketing process or auction for the Unsold Assets, subject to Sections 1.4, 2.2, and 13.1 and the WIL Stalking Horse APA.

**Section 13.9 Closing the Auction.** The Auction shall continue until the Debtors, in consultation with the Consultation Parties, determine that further bidding is unlikely to result in a higher or otherwise better Bid for the Locations being auctioned, and shall not close until each Qualified Bidder has had a reasonable opportunity to submit an Overbid. The Auction shall close when the Debtors, in consultation with the Consultation Parties, announce that the Successful Bid(s) and Backup Bid(s) have been selected for all Locations being auctioned. The Debtors shall not consider any Bid submitted after the close of the Auction.

## ARTICLE 14
## SUCCESSFUL AND BACKUP BIDDERS

**Section 14.1 Successful Bids.** At the conclusion of the Auction (or upon cancellation pursuant to Section 13.1), the Debtors, in consultation with the Consultation Parties, shall select the highest or otherwise best Qualified Bid or Bids for each Location or grouping (each, a "Successful Bid," and the Qualified Bidder submitting it, a "Successful Bidder"). Within one business day after the close of the Auction, the Debtors shall file with the Court and serve on the Notice Parties, the Franchisor, and all affected counterparties a notice identifying each Successful Bidder and Backup Bidder, the Locations to be acquired, the Purchase Price and allocation, and the Proposed Assumed Contracts, and attaching the applicable definitive agreement and proposed Sale Order (the "Notice of Successful Bidder"). Each Successful Bidder shall, within one business day after the Auction, execute definitive documentation reflecting its Successful Bid and supplement its Good Faith Deposit to equal ten percent (10%) of its final Purchase Price; provided that the deposit for the WIL Stalking Horse Bid shall be governed by the WIL Stalking Horse APA and Section 7.9(d).

**Section 14.2 Backup Bids.** The Qualified Bid(s) that the Debtors, in consultation with the Consultation Parties, determine to be the next highest or otherwise best Bid(s) for any Location or grouping shall be the backup bid (each, a "Backup Bid," and the Qualified Bidder submitting it, a "Backup Bidder"). Each Backup Bid shall remain open and irrevocable until the Backup Bid Expiration Date. If a Successful Bidder fails to consummate its Sale Transaction, the Debtors may, without further order of the Court and upon notice filed with the Court, designate the applicable Backup Bidder as the Successful Bidder, and the Backup Bidder shall consummate the Sale Transaction on the terms of its Backup Bid. A Bidder may be both a Successful Bidder for certain Locations and a Backup Bidder for others.

**Section 14.3 Fiduciary Out.** Nothing in these Bidding Procedures shall require the Debtors or their directors, managers, officers, or members to take any action, or refrain from taking any action, that they determine in good faith, after consultation with counsel, would be inconsistent with their fiduciary duties under applicable law, including the right to consider and accept an unsolicited proposal or a Plan alternative.

## ARTICLE 15
## GOOD FAITH DEPOSITS

**Section 15.1 Escrow.** All Good Faith Deposits shall be held in escrow by the Escrow Agent and shall not become property of the Debtors' estates unless and until released to the Debtors in accordance with these Bidding Procedures, but shall be subject to the jurisdiction of the Court.

**Section 15.2 Return.** Good Faith Deposits of Qualified Bidders that are not selected as Successful Bidders or Backup Bidders shall be returned within three business days after the conclusion of the Auction. The Good Faith Deposit of a Backup Bidder shall be returned within three business days after the Backup Bid Expiration Date. The Good Faith Deposit of a Successful Bidder shall be applied to the Purchase Price at closing.

**Section 15.3 Forfeiture.** If a Successful Bidder or Backup Bidder (when designated as Successful Bidder) fails to consummate its Sale Transaction because of its breach or failure to perform, the Debtors shall be entitled to retain its Good Faith Deposit as part of their damages, without prejudice to the Debtors' right to seek additional damages and their other rights and remedies (to the extent provided in the applicable definitive agreement); such retention is not, and is not intended to be, liquidated damages. Retained Good Faith Deposits shall constitute proceeds of the applicable Assets and shall be subject to the liens of the applicable Prepetition Secured Lenders and the Cash Collateral Orders. This Section 15.3 does not apply to the WIL Deposit.

**Section 15.4 Stalking Horse Deposit.** The deposit of any Stalking Horse Bidder shall be held, returned, or forfeited in accordance with the Stalking Horse APA, and the WIL Deposit shall be governed exclusively by Section 7.9(d).

## ARTICLE 16
## SALE HEARING AND OBJECTIONS

**Section 16.1 Sale Hearing.** The Sale Hearing shall be held before the Honorable James. W. Boyd, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Western District of Michigan, One Division Ave. N., Grand Rapids, Michigan 49503, on **December 29, 2026, at 10:00 a.m.** (prevailing Eastern Time), or at such other time as the Court may direct. The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, by announcement in open court or by notice filed on the docket; provided that no adjournment shall result in the Sale Order being entered after December 31, 2026 without the written consent of WIL.

**Section 16.2 Objection Deadlines.** Objections must (a) be in writing, (b) state with particularity the legal and factual basis therefor, (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Western District of Michigan, and (d) be filed with the Court and served on the Notice Parties, as follows:

(i) Sale Objections. Objections to the relief requested in the Motion, including the sale of the Assets free and clear of liens, claims, encumbrances, and interests, must be filed by **December 22, 2026, at 4:00 p.m.** (the "Sale Objection Deadline").

(ii) Auction Objections. Objections solely to the conduct of the Auction, the identity of any Successful Bidder, or the terms of any Successful Bid (other than adequate assurance) must be filed by **December 22, 2026, at 4:00 p.m.** (the "Auction Objection Deadline").

(iii) Adequate Assurance Objections. Objections to the adequate assurance of future performance of a Successful Bidder (other than a Stalking Horse Bidder, as to which adequate assurance objections shall be due by the Cure/Assignability Objection Deadline) must be filed by **December 22, 2026, at 4:00 p.m.** (the "Adequate Assurance Objection Deadline").

(iv) Replies. The Debtors and any other party may file a reply to any objection by **December 28, 2026, at 12:00 p.m.** (the "Reply Deadline").

**Section 16.3 Failure to Object.** Any party that fails to timely file and serve an objection in accordance with this Article 16 shall be forever barred from asserting such objection to the relief requested in the Motion or the consummation of the applicable Sale Transaction, and shall be deemed to consent to the sale of the Assets free and clear of liens, claims, encumbrances, and interests for purposes of section 363(f)(2) of the Bankruptcy Code.

**Section 16.4 Closing.** Each Successful Bidder shall consummate its Sale Transaction as soon as practicable after entry of the Sale Order and in any event by the Outside Closing Date. The Debtors shall seek a waiver of the stay under Bankruptcy Rules 6004(h) and 6006(d).

## ARTICLE 17
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Section 17.1 Cure Notice.** On or before **December 4, 2026**, the Debtors shall file with the Court and serve on each counterparty to a Contract or Lease that may be assumed and assigned in connection with a Sale Transaction (each, a "Counterparty") a notice (the "Assumption and Assignment Notice" or "Cure Notice") that (a) identifies the Contract or Lease, (b) states the Debtors' calculation of the Cure Costs, (c) describes the procedures for objecting, and (d) states that the Successful Bidder's Adequate Assurance Information will be made available upon request on a confidential basis. Service of a Cure Notice shall not constitute an admission that any Contract or Lease is executory or unexpired, or that it will be assumed and assigned.

**Section 17.2 Supplemental Cure Notices.** If the Debtors identify additional Contracts or Leases to be assumed and assigned, or modify any Cure Cost, the Debtors shall file and serve a supplemental notice (a "Supplemental Cure Notice") on the affected Counterparties, who shall have seven days after service to object; provided that any objection to a Supplemental Cure Notice served after December 21, 2026 shall, unless resolved, be treated as an Adjourned Cure Objection under Section 17.4 and shall not delay the Sale Hearing or entry of the Sale Order.

**Section 17.3 Cure/Assignability Objections.** Any objection to the proposed Cure Costs, or to the assumption and assignment of a Contract or Lease on any basis other than adequate assurance of a Successful Bidder (a "Cure/Assignability Objection"), must be filed and served by **December 22, 2026, at 4:00 p.m.** (the "Cure/Assignability Objection Deadline") and must state the cure amount asserted and include appropriate documentation.

**Section 17.4 Resolution; Adjourned Cure Objections.** The Debtors and the Counterparty shall attempt to resolve any timely Cure/Assignability Objection consensually. Unresolved objections shall be heard at the Sale Hearing or, at the Debtors' election, at a later date (an "Adjourned Cure Objection"). If an objection relates solely to Cure Costs, the Contract or Lease may be assumed and assigned upon closing, provided that the Debtors or Successful Bidder, as applicable, reserve cash in the amount of the disputed Cure Costs pending resolution.

**Section 17.5 Failure to Object.** Any Counterparty that fails to timely object shall be (a) forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, the Successful Bidder, or the property of either, and (b) deemed to

have consented to the assumption and assignment of its Contract or Lease, including for purposes of section 365(c)(1) of the Bankruptcy Code.

**Section 17.6 Designation Rights; Exclusion.** A Successful Bidder may, in accordance with its definitive agreement, add or remove Contracts or Leases from its list of Proposed Assumed Contracts at any time prior to closing (or such later date as provided in a Sale Order), upon notice to the affected Counterparty. A Contract or Lease removed before closing shall not be assumed and assigned, and the Debtors reserve all rights to assume, assign, or reject it.

**Section 17.7 Landlord Rights Preserved.** Nothing herein shall waive or impair (a) any right of a landlord under section 365(b)(3) or 365(d)(3) of the Bankruptcy Code, (b) any landlord's right to object to any proposed change of use or concept, or (c) any landlord's right to object to the sale of any Lease free and clear of any interest arising under the Lease, in each case in accordance with these Bidding Procedures.

## ARTICLE 18
## FRANCHISOR MATTERS

**Section 18.1 Reinstatement; Franchisor Consent and Approval.** In accordance with the Settlement Agreement, QIOR will consent to the sale of the Purchased Restaurants, CT/MA Restaurants and the NC Restaurants through the Auction. In accordance with the Settlement Agreement, immediately prior to the closing of the sale of any Purchased Restaurant, CT/MA Restaurant, or NC Restaurant, the applicable Wendy's Franchise Agreements shall be reinstated solely for the purpose of effectuating such sale. Effective as of such closing, (a) as to Purchased Restaurants acquired by WIL, the reinstated Wendy's Franchise Agreements shall terminate, and (b) as to Locations acquired by a new or existing franchisee approved by QIOR, QIOR shall consent either to the entry into new franchise agreements or to the assumption and assignment of the reinstated Wendy's Franchise Agreements to such franchisee. Franchisor has agreed that the Debtors may market the Locations and represent to Potential Bidders that the applicable Wendy's Franchise Agreements will be reinstated at closing as described herein. QIOR reserves its consent rights with respect to the transfer of any Wendy's Franchise Agreement in accordance with its terms and QIOR's transaction and transfer policies, and will review any Qualified Bidder, based on information provided in response to the Franchisor Approval Materials, to determine whether such Qualified Bidder is capable of complying with such terms and policies, under an expedited new franchisee approval and consent process to be mutually agreed by QIOR and the Debtors. Bidders are advised that the timing of franchisee approval may affect the ability to close by the Outside Closing Date. If the Settlement Agreement is not approved, QIOR's consent may not be provided for the assumption and assignment of the Franchise Agreements.

**Section 18.2 Franchisor Communications and Materials.** Notwithstanding Section 4.5, the Franchisor may communicate directly with Potential Bidders and Acceptable Bidders (with Intrepid on copy for any communications) regarding its franchisee approval process, qualification criteria, development and reimaging requirements, and related matters, and Potential Bidders may initiate such communications; provided that the Debtors' Advisors are given reasonable advance notice of, and the opportunity to participate in, any substantive communications regarding the terms of any Bid. Upon request of the Debtors, the Franchisor is requested to provide a written description of its franchisee approval criteria and process (the "Franchisor Approval Materials"), which the Debtors shall post in the Data Room. The posting of Franchisor Approval Materials

shall not constitute an agreement by the Debtors as to the applicability or enforceability of any criteria described therein.

**Section 18.3 Information to Franchisor.** The Debtors shall provide to QIOR (a) the identity of each Bidder that proposes to assume and take assignment of the Franchise Agreements or to operate Locations under the Wendy's brand, (b) the Locations subject to such Bid, (c) all information responsive to the Franchisor Approval Materials, and (d) the Adequate Assurance Information of such Bidder, together with periodic updates regarding the Sale Process. The Franchisor shall not receive pricing information with respect to competing Bids except as the Debtors determine, in consultation with the Consultation Parties, or the Court orders.[4]

**Section 18.4 Conversion Bids.** A Bidder may submit a Conversion Bid to acquire Locations, owned real estate, or Leases without franchise rights. A Conversion Bid must disclose (a) the intended use and concept for each affected Location, (b) the Bidder's plan and timeline for de-identification of the Wendy's trade dress, signage, and proprietary marks, and (c) whether the intended use complies with the applicable Lease use and exclusivity provisions. Nothing herein authorizes any use of the Franchisor's marks or proprietary systems by a purchaser not approved as a franchisee, and the rights of the Franchisor with respect to de-identification, post-termination covenants, and any related obligations are reserved, as are the Debtors' rights to contest the enforceability thereof.

**Section 18.5 Franchisor Cure Costs.** Any Sale Transaction that includes a Wendy's Location must provide for payment at closing, by wire transfer directly to QIOR and its affiliates from the proceeds of such Sale Transaction, of all royalties, advertising contributions, WeTech fees, rents, and other accrued amounts unpaid by the Debtors to QIOR and its affiliates (including The Wendy's National Advertising Program, Inc., Wendy's Technology, LLC, and applicable local advertising cooperatives) with respect to the Locations sold, through the closing date (the "Franchisor Cure Costs"). Franchisor Cure Costs shall not include (a) amounts owed with respect to any Designated Restaurant, Additional Designated Restaurant, or restaurant closed prior to closing, (b) solely as to the Purchased Restaurants, interest and late fees, or (c) professional fees and expenses. The Franchisor Cure Costs accrued through September 16, 2026 for the Purchased Restaurants and the CT/MA Restaurants shall not exceed the amounts set forth in the schedule of prepetition cure amounts as of September 16, 2026 agreed among the Debtors, QIOR, WIL, and the Administrative Agent, which schedule shall be posted in the Data Room, plus amounts accrued and unpaid on or after September 16, 2026.

## ARTICLE 19
## CONSULTATION PARTIES AND NOTICE PARTIES

**Section 19.1 Consultation Parties.** For the avoidance of doubt, none of WIL, QIOR, or their affiliates shall be a Consultation Party.

**Section 19.2 Loss of Consultation Party Status.** A Consultation Party (or any of its affiliates) that submits a Bid, participates in a Bid, or informs the Debtors of its intention to do so

[4] Because QIOR is an affiliate of WIL, information provided to QIOR or its counsel regarding competing Bidders shall be used solely for purposes of the franchisee approval process and shall not be shared with WIL or with any personnel or advisors involved in the WIL Stalking Horse Bid.

shall cease to be a Consultation Party with respect to the Assets subject to such Bid, as provided in Section 12.5. Consultation rights shall not be exercised in a manner that confers a bidding advantage.

**Section 19.3** **Updates.** The Debtors and the Investment Banker shall host update calls with the Consultation Parties at least weekly during the Sale Process (or as otherwise agreed) and shall provide reasonably prompt updates regarding material developments. The Debtors shall provide periodic updates to counsel to the Franchisor on the professional-eyes-only basis described in Sections 8.1 and 18.3.

**Section 19.4** **Notice Parties.** The "Notice Parties" are:

(a) the Debtors, c/o Kevin Cleary, Chief Restructuring Officer, Fort Dearborn Partners, 45 Ottawa Ave SW, Suite 600, Grand Rapids, Michigan 49503 (kcleary@fortdearbornpartners.com);

(b) the Investment Banker, Intrepid Investment Bankers LLC, 1221 Avenue of the Americas, 9th Floor, New York, NY 10020, Attn: Kenneth Garnett (KGarnett@intrepidib.com) and Ana Alvarenga (aalvarenga@intrepidib.com);

(c) counsel to the Debtors, McDonald Hopkins LLC, 600 Superior Avenue, East, Suite 2100, Cleveland, OH 44114, Attn: Scott N. Opincar (sopincar@mcdonaldhopkins.com) and Michael J. Kaczka (mkaczka@mcdonaldhopkins.com);

(d) the Office of the United States Trustee for Region 9; 125 Ottawa Avenue NW, Suite 200R, Grand Rapids, MI 49503; Attn: Elizabeth K. Patrick (Elizabeth.K.Patrick@usdoj.gov);

(e) counsel to City National Bank, as Administrative Agent, Barnes & Thornburg LLP, 3340 Peachtree Road NE, Suite 2900, Atlanta, Georgia 30326, Attn: Frank W. DeBorde (fdeborde@btlaw.com) and Lisa Wolgast (lwolgast@btlaw.com);

(f) counsel to Old National Bank, Venable LLP, 801 Brickell Avenue, Suite 1500, Miami, FL 33131, Attn: Paul Battista (pjbattista@Venable.com);

(g) counsel to the Committee, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, Attn: David M. Posner (DPosner@lowenstein.com) and Gianfranco Finizio (GFinizio@lowenstein.com);

(h) counsel to Union Bank, Bodman PLC, 1901 St. Antoine Street, 6th Floor at Ford Field, Detroit, MI 48226, Attn: Marc Bakst (MBakst@bodmanlaw.com); and

(i) counsel to QIOR and the Franchisor, Greenberg Traurig, LLP One Vanderbilt Avenue, New York, NY 10017, Attn: Nathan Haynes (haynesn@gtlaw.com) and Brian Greer (greerb@gtlaw.com).

**Section 19.5** **Claims and Noticing Agent.** Copies of these Bidding Procedures, the Bidding Procedures Order, and all related notices may be obtained free of charge from the website of Kroll Restructuring Administration ("Kroll") at https://restructuring.ra.kroll.com/meritage.

## ARTICLE 20
## AS IS, WHERE IS; FREE AND CLEAR

**Section 20.1 As Is, Where Is.** Except as otherwise provided in a definitive agreement approved by the Court, the Assets shall be sold "as is, where is," and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates.

**Section 20.2 Free and Clear.** Except as otherwise provided in a Successful Bidder's definitive agreement or the Sale Order, all of the Debtors' right, title, and interest in the Assets shall be sold free and clear of all liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, with such liens, claims, encumbrances, and interests attaching to the net proceeds of the sale with the same validity, priority, and extent as existed immediately prior to the sale, subject to the Cash Collateral Orders.

## ARTICLE 21
## RESERVATION OF RIGHTS

**Section 21.1 Debtors' Reservation.** Subject to Section 2.2 and the Bidding Procedures Order, the Debtors reserve the right, in their business judgment and in consultation with the Consultation Parties, to (a) modify these Bidding Procedures or impose additional terms and conditions; (b) extend deadlines; (c) adjourn, reschedule, or cancel the Auction; (d) reject any Bid that is inadequate, insufficient, not in conformity with these Bidding Procedures, or contrary to the best interests of the estates; (e) withdraw any Assets from the Sale Process at any time; and (f) pursue a Plan or other alternative transaction; provided that no such modification shall be materially inconsistent with the Bidding Procedures Order, impair the rights of the Franchisor or any Counterparty, or affect any Stalking Horse Bidder's rights under an approved Stalking Horse APA.

**Section 21.2 Parties' Reservation.** Nothing herein shall impair the rights of (a) the Committee, including its challenge rights under the Cash Collateral Orders and its right to object to any Sale Transaction; (b) the Prepetition Secured Lenders, including under the Cash Collateral Orders and section 363(k) of the Bankruptcy Code; (c) the Franchisor, as provided in Article 18; (d) any landlord or Counterparty, as provided in Article 17; or (e) the United States Trustee.

## ARTICLE 22
## CONSENT TO JURISDICTION; JURY WAIVER

**Section 22.1 Consent.** All Potential Bidders, Acceptable Bidders, and Qualified Bidders shall be deemed to have (a) consented to the core jurisdiction of the Court to enter any order related to these Bidding Procedures, the Auction, or any Sale Transaction; (b) waived any right to a jury trial in connection with any disputes relating thereto; and (c) consented to the entry of a final order or judgment by the Court on any such matter, to the extent it is later determined that the Court, absent consent, cannot enter such final order or judgment consistent with Article III of the United States Constitution.

## ARTICLE 23
## MISCELLANEOUS

**Section 23.1** **Bulk Sales.** No bulk sales law or similar law of any state or other jurisdiction shall apply to any Sale Transaction.

**Section 23.2** **Modification.** Except as set forth in Section 21.1, these Bidding Procedures may not be modified except as expressly provided herein or by further order of the Court.

**Section 23.3** **Conflicts.** In the event of any conflict between these Bidding Procedures and the Bidding Procedures Order, the Bidding Procedures Order shall govern. In the event of any conflict between these Bidding Procedures and an approved Stalking Horse APA as to the matters addressed therein, the order approving such Stalking Horse APA (or, in the case of the WIL Stalking Horse APA, the WIL Stalking Horse APA as approved by the Bidding Procedures Order, consistent with Section 7.9) shall govern.

**Section 23.4** **Costs.** Except for approved Bid Protections, each Bidder shall bear its own costs and expenses in connection with the Sale Process.

**SCHEDULE A**
**Locations by State and Debtor Entity**

# SCHEDULE B
## Designated Lots

# EXHIBIT 2

## Sale Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MERITAGE HOSPITALITY GROUP INC., *et al.*,[1] | ) | Case No. 26-02947 (JWB) |
| Debtors. | ) | (Jointly Administered) |

## NOTICE OF PROPOSED SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On November 12, 2026, Meritage Hospitality Group Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed a motion [Docket No. [•]] (the "Motion") with the United States Bankruptcy Court for the Western District of Michigan (the "Court") seeking, among other things, approval of procedures (the "Bidding Procedures") for the sale of all, substantially all, or any portion of the Debtors' assets (the "Assets"), including their restaurant Locations, in one or more Sale Transactions, and approval of such Sale Transactions free and clear of all liens, claims, encumbrances, and interests. On [•], 2026, the Court entered an order approving the Bidding Procedures [Docket No. [•]] (the "Bidding Procedures Order").[2]

**Assets to Be Sold**

The Assets include the Debtors' Wendy's restaurants (other than the Tennessee Restaurants, the Designated Restaurants, and the Additional Designated Restaurants), the Independent Concept Locations operated under the Morning Belle and Blue Porch Bar & Grill brands, owned real property (including the Purchased RE), the OCM Assets, and related Contracts, Leases, equipment, inventory, and other assets. Bids may be Enterprise Bids, Partial Bids, or any combination thereof, and may be submitted for all of the Locations, any Designated Lot (including the CT/MA Restaurants and the NC Restaurants), any individual Location, the Purchased RE (subject to the WIL Stalking Horse Bid), the OCM Assets, or any combination thereof. The NC Restaurants may be sold by private sale outside of the Auction by the Debtors and Old National upon notice.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Meritage Hospitality Group Inc. (0460); MHG Food Service, Inc. (5926); OCM Development, LLC (7384); Wen Carolinas, LLC (3792); Wen Georgia, LLC (7369); Wen Ohio, LLC (5959); Wen Oklahoma, LLC (8802); Wen South, LLC (1229); Wen Tennessee, LLC (2477); Wen Virginia, LLC (2840); WM Limited Partnership-1998 (9989); RES Management, LLC (9105); Inspired By Opportunity, LLC (3681); Uncommon Hospitality, LLC (8858); and Chicken Ventures, LLC (7215). The corporate headquarters and the mailing address for the Debtors is 45 Ottawa Ave SW Suite 600, Grand Rapids, MI 49503.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

**Stalking Horse Bid**

The Debtors have entered into an asset purchase agreement with Wendy's International, LLC ("WIL"), as of November 21, 2026 (the "WIL Stalking Horse APA"), for the acquisition of 163 Purchased Restaurants for a net cash base purchase price of $45,918,000, subject to adjustment, and four parcels of Purchased RE for $6,000,000. The WIL Stalking Horse Bid is subject to higher or otherwise better offers in accordance with the Bidding Procedures. WIL is not entitled to any bid protections. The Debtors may designate additional Stalking Horse Bidders for other Locations by the Stalking Horse Designation Deadline, with Bid Protections of up to 3.0% of the cash purchase price, by filing a Stalking Horse Notice.

**Key Dates and Deadlines**

| Event | Date and Time (prevailing Eastern Time) |
|---|---|
| LOI Deadline | December 1, 2026, at 5:00 p.m. |
| Stalking Horse Designation Deadline | December 7, 2026 |
| Stalking Horse Objection Deadline | December 9, 2026, at 5:00 p.m. |
| Bid Deadline | December 11, 2026, at 5:00 p.m. |
| Auction (if necessary) | December 17, 2026, at 10:00 a.m., at the offices of Barnes & Thornburg LLP, 171 Monroe Ave NW #1000, Grand Rapids, MI 49503, or virtually |
| Cure/Assignability Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Sale Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Auction Objection Deadline and Adequate Assurance Objection Deadline | December 22, 2026, at 4:00 p.m. |
| Reply Deadline | December 28, 2026, at 12:00 p.m. |
| Sale Hearing | December 29, 2026, at 10:00 a.m. |
| Outside Closing Date | January 5, 2027 |

**Participation in the Sale Process**

Any party interested in submitting a Bid should contact the Debtors' investment banker, Intrepid Investment Bankers LLC, Kenneth Garnett (KGarnett@intrepidib.com) and Ana Alvarenga (aalvarenga@intrepidib.com). To receive diligence, a Potential Bidder must deliver an executed Confidentiality Agreement and disclose the identity of the Potential Bidder and its principals to the Debtors' Advisors. Each Bid must include a Good Faith Deposit equal to 10% of the Purchase

Price (or the cash component of a credit bid), delivered to Chicago Title as Escrow Agent. Only parties that satisfy the participation and bid requirements set forth in the Bidding Procedures.

**Sale Hearing and Objections**

The Sale Hearing will be held before the Honorable James W. Boyd, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Western District of Michigan, One Division Ave. N., Grand Rapids, Michigan 49503, on December 29, 2026, at 10:00 a.m. (prevailing Eastern Time), or such other time as the Court may direct. The Sale Hearing may be adjourned by announcement in open court or by notice filed on the docket.

Objections must (a) be in writing; (b) state with particularity the legal and factual basis therefor; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Western District of Michigan; and (d) be filed with the Court and served on the Notice Parties identified in Section 19.4 of the Bidding Procedures, including counsel to the Debtors, McDonald Hopkins LLC, 600 Superior Avenue East, Suite 2100, Cleveland, OH 44114, by the applicable deadline.

**ANY PARTY THAT FAILS TO TIMELY FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING SUCH OBJECTION TO THE SALE TRANSACTIONS, INCLUDING THE TRANSFER OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND SHALL BE DEEMED TO CONSENT THERETO FOR PURPOSES OF SECTION 363(f)(2) OF THE BANKRUPTCY CODE.**

**Additional Information**

Copies of the Motion, the Bidding Procedures Order, and the Bidding Procedures may be obtained free of charge at https://restructuring.ra.kroll.com/meritage. This notice is subject to the full terms of the Bidding Procedures and the Bidding Procedures Order, which control in the event of any conflict.

Dated: [●], 2026

Respectfully submitted,

/s/ [Draft]

MCDONALD HOPKINS LLC
Scott N. Opincar
Michael J. Kaczka
Maria G. Carr (admitted *pro hac vice*)
600 Superior Ave. East, Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Email: sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com
mcarr@mcdonaldhopkins.com

*Counsel for the Debtors and Debtors in Possession*

# EXHIBIT 3

## Assumption and Assignment Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MERITAGE HOSPITALITY GROUP INC., *et al.*,[1] | ) | Case No. 26-02947 (JWB) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND PROPOSED CURE COSTS**

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY BE A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS THAT MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH A SALE TRANSACTION.**

This notice (the "Assumption and Assignment Notice" or "Cure Notice") is served pursuant to Section 17.1 of the Bidding Procedures, and you are receiving it as a counterparty (a "Counterparty") to one or more Contracts or Leases. On [•], 2026, the Court entered the Bidding Procedures Order [Docket No. [•]] approving, among other things, the Bidding Procedures and the Assumption and Assignment Procedures in connection with the sale of the Debtors' Assets. The Debtors may assume and assign the Contracts and Leases listed on **Schedule 1** hereto to one or more Successful Bidders. Schedule 1 sets forth the Debtors' calculation of the amounts necessary to cure all monetary defaults under each Contract or Lease pursuant to section 365(b) of the Bankruptcy Code (the "Cure Costs").

Inclusion of a Contract or Lease on Schedule 1 does not constitute an admission that it is executory or unexpired, or that it will be assumed and assigned, and all rights are reserved. The Adequate Assurance Information of any Successful Bidder will be made available upon request on a confidential basis.

**Objection Deadlines**

(a) **Cure/Assignability Objections.** Any objection to the proposed Cure Costs or to assumption and assignment on any basis other than the adequate assurance of a Successful Bidder must be filed and served by **December 22, 2026, at 4:00 p.m.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Meritage Hospitality Group Inc. (0460); MHG Food Service, Inc. (5926); OCM Development, LLC (7384); Wen Carolinas, LLC (3792); Wen Georgia, LLC (7369); Wen Ohio, LLC (5959); Wen Oklahoma, LLC (8802); Wen South, LLC (1229); Wen Tennessee, LLC (2477); Wen Virginia, LLC (2840); WM Limited Partnership-1998 (9989); RES Management, LLC (9105); Inspired By Opportunity, LLC (3681); Uncommon Hospitality, LLC (8858); and Chicken Ventures, LLC (7215). The corporate headquarters and the mailing address for the Debtors is 45 Ottawa Ave SW Suite 600, Grand Rapids, MI 49503.

**(prevailing Eastern Time)** (the "Cure/Assignability Objection Deadline") and must state the cure amount asserted and include appropriate documentation.

(b) **Adequate Assurance Objections.** The Notice of Successful Bidder identifying the Successful Bidders will be filed by December 18, 2026. Any objection to the adequate assurance of future performance of a Successful Bidder (other than a Stalking Horse Bidder, as to which objections are due by the Cure/Assignability Objection Deadline) must be filed and served by **December 22, 2026, at 4:00 p.m. (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline").

(c) **Supplemental Cure Notices.** Counterparties served with a Supplemental Cure Notice shall have fourteen days after service to object; *provided* that any objection to a Supplemental Cure Notice served after December 21, 2026 shall, unless resolved, be treated as an Adjourned Cure Objection and shall not delay the Sale Hearing or entry of the Sale Order.

Objections must be in writing, state with particularity the legal and factual basis therefor, comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Western District of Michigan, and be filed with the Court and served on the Notice Parties identified in Section 19.4 of the Bidding Procedures.

The Debtors and the applicable Counterparty will first attempt to resolve any timely objection consensually. Unresolved objections will be heard at the Sale Hearing on December 29, 2026, at 10:00 a.m. (prevailing Eastern Time) before the Honorable James W. Boyd, or, at the Debtors' election, at a later date (an "Adjourned Cure Objection"). If an objection relates solely to Cure Costs, the Contract or Lease may be assumed and assigned at closing, *provided* that the Debtors or the Successful Bidder reserve cash in an amount equal to the disputed amount.

A Successful Bidder may add or remove Contracts or Leases from the list of Proposed Assumed Contracts at any time prior to closing upon notice to the applicable Counterparty. Any Contract or Lease so removed will not be assumed and assigned, and the Debtors reserve all rights with respect thereto. Consistent with Section 17.7 of the Bidding Procedures, nothing herein waives any landlord's rights under sections 365(b)(3) or 365(d)(3) of the Bankruptcy Code, the right to object to any change of use or concept, or the right to object to a sale free and clear of interests under a Lease.

**IF YOU FAIL TO TIMELY OBJECT, YOU WILL BE (A) FOREVER BARRED FROM OBJECTING TO THE CURE COSTS AND FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS AGAINST THE DEBTORS, THE SUCCESSFUL BIDDER, OR THE PROPERTY OF EITHER, AND (B) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND ASSIGNMENT OF YOUR CONTRACT OR LEASE, INCLUDING FOR PURPOSES OF SECTION 365(c)(1) OF THE BANKRUPTCY CODE.**

Copies of the Bidding Procedures Order and related documents are available free of charge at https://restructuring.ra.kroll.com/meritage.

Dated: [●], 2026

Respectfully submitted,

/s/ [Draft]

MCDONALD HOPKINS LLC
Scott N. Opincar
Michael J. Kaczka
Maria G. Carr (admitted *pro hac vice*)
600 Superior Ave. East, Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Email: sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com
mcarr@mcdonaldhopkins.com

*Counsel for the Debtors and Debtors in Possession*

**Schedule 1**

| Debtor | Counterparty | Contract / Lease Description | Location (Store No. and Address) | Proposed Cure Cost |
|---|---|---|---|---|
| [•] | [•] | [•] | [•] | $[•] |

# EXHIBIT 4

## Notice of Successful Bidder

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| In re: | Chapter 11 |
| MERITAGE HOSPITALITY GROUP INC., *et al.*,[1] | Case No. 26-02947 (JWB) |
| Debtors. | (Jointly Administered) |

**NOTICE OF SUCCESSFUL BIDDER(S) AND BACKUP BIDDER(S)**

PLEASE TAKE NOTICE that, pursuant to the Bidding Procedures Order [Docket No. [•]], [the Debtors conducted the Auction on December 17, 2026] [the Debtors cancelled the Auction as to the Locations identified below pursuant to Section 13.1 of the Bidding Procedures]. This notice is filed and served pursuant to Section 14.1 of the Bidding Procedures on the Notice Parties, the Franchisor, and all affected counterparties.

PLEASE TAKE FURTHER NOTICE that the Debtors, in consultation with the Consultation Parties, have selected the following Successful Bid(s) and Backup Bid(s):

| Locations / Designated Lot | Successful Bidder | Purchase Price and Allocation | Backup Bidder | Backup Bid |
|---|---|---|---|---|
| [•] | [•] | $[•] | [•] | $[•] |

Attached hereto are (a) the definitive agreement(s) with each Successful Bidder as **Exhibit A**; (b) the list of Proposed Assumed Contracts as **Exhibit B**; and (c) the proposed Sale Order(s) as

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Meritage Hospitality Group Inc. (0460); MHG Food Service, Inc. (5926); OCM Development, LLC (7384); Wen Carolinas, LLC (3792); Wen Georgia, LLC (7369); Wen Ohio, LLC (5959); Wen Oklahoma, LLC (8802); Wen South, LLC (1229); Wen Tennessee, LLC (2477); Wen Virginia, LLC (2840); WM Limited Partnership-1998 (9989); RES Management, LLC (9105); Inspired By Opportunity, LLC (3681); Uncommon Hospitality, LLC (8858); and Chicken Ventures, LLC (7215). The corporate headquarters and the mailing address for the Debtors is 45 Ottawa Ave SW Suite 600, Grand Rapids, MI 49503.

**Exhibit C**. The Debtors' presentation of a Successful Bid to the Court does not constitute acceptance of such Bid, which shall be deemed accepted only upon entry of a Sale Order.

Objections to the conduct of the Auction, the identity of any Successful Bidder, or the terms of any Successful Bid ("Auction Objections") and Adequate Assurance Objections, must be filed and served by December 22, 2026, at 4:00 p.m. (prevailing Eastern Time). Replies to any such objections must be filed by December 28, 2026, at 12:00 p.m. (prevailing Eastern Time).

The Sale Hearing will be held on December 29, 2026, at 10:00 a.m. (prevailing Eastern Time) before the Honorable James W. Boyd, United States Bankruptcy Court for the Western District of Michigan, One Division Ave. N., Grand Rapids, Michigan 49503.

Each Successful Bidder has executed (or will, within one (1) business day after the conclusion of the Auction, execute) definitive documentation for its Successful Bid and supplement its Good Faith Deposit to an amount equal to ten percent (10%) of its final Purchase Price; *provided* that the WIL Deposit shall be governed by Section 7.9(e) of the Bidding Procedures. Each Backup Bid shall remain open and irrevocable until the Backup Bid Expiration Date (the earlier of (a) closing of the Sale Transaction with the Successful Bidder for the relevant Assets and (b) January 5, 2027). Good Faith Deposits of Qualified Bidders not selected as a Successful Bidder or Backup Bidder will be returned within three (3) business days after the conclusion of the Auction. Each Sale Transaction must close by the Outside Closing Date, January 5, 2027.

If a Successful Bidder fails to consummate its Sale Transaction, the Debtors may, without further order of the Court and upon notice filed with the Court, designate the applicable Backup Bidder as the Successful Bidder. Copies of all documents are available free of charge at https://restructuring.ra.kroll.com/meritage.

Dated: [●], 2026

Respectfully submitted,

/s/ [Draft]

MCDONALD HOPKINS LLC
Scott N. Opincar
Michael J. Kaczka
Maria G. Carr (admitted *pro hac vice*)
600 Superior Ave. East, Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Email: sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com
mcarr@mcdonaldhopkins.com

*Counsel for the Debtors and Debtors in Possession*